BEVERLY HILLS CONCEPTS, INC., ET AL. *v.*
SCHATZ AND SCHATZ, RIBICOFF
AND KOTKIN ET AL.
(SC 15730)

Norcott, Katz, Palmer, Peters and E. O'Connell, Js.

Argued June 4—officially released September 15, 1998

*Mark R. Kravitz,* with whom were *Daniel J. Klau* and *William J. Doyle,* for the appellants-appellees (defendants).

*Jeffrey J. Tinley,* with whom, on the brief, were *Steven D. Ecker* and *Paula A. Platano,* for the appellee-appellant (named plaintiff).

KATZ, J. The principal issue in this appeal is the proper method for calculating damages for the destruction of a nascent business. We conclude that: (1) unestablished enterprises must be permitted to recover damages for legal malpractice and that a flexible approach in determining those damages generally is appropriate; (2) lost profits for a reasonable period of time may serve as an appropriate measure of damages under certain circumstances; and (3) the plaintiff bears the burden of proving lost profits to a reasonable certainty. As applied to the facts of this case, however, we conclude that the plaintiff has not sustained its burden of proof regarding damages.

This appeal arises from a malpractice action brought by Beverly Hills Concepts, Inc. (plaintiff)[1] against the named defendant, the law firm, Schatz and Schatz, Ribicoff and Kotkin (Schatz & Schatz), and the individual defendants, attorneys Stanford Goldman, Ira Dansky and Jane Seidl. In its complaint, dated November 2, 1989, the plaintiff alleged legal malpractice (first count), breach of contract (second count), intentional misrepresentation (third and fifth counts), negligent misrepresentation (fourth count), breach of fiduciary duty (sixth count), breach of the covenant of good faith and fair dealing (seventh count), and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. (eighth count).[2] On January 27,

---

[1] The complaint also named as individual plaintiffs three of the officers of Beverly Hills Concepts, Inc., Charles Remington, Wayne Steidle, and Jeannie Leitao. The trial court determined that those individual plaintiffs lacked standing to maintain this action, which was based on harm to the corporation. That conclusion is not contested in this appeal. Accordingly, we refer to Beverly Hills Concepts, Inc., as the plaintiff.

[2] General Statutes § 42-110b provides in relevant part: "Unfair trade practices prohibited. Legislative intent. (a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

1997, following a trial to the court, Hon. Robert J. Hale, judge trial referee, rendered judgment for the plaintiff on the first, second, fourth, sixth and seventh counts, and for the defendants on the third, fifth and eighth counts. The trial court awarded the plaintiff damages in the amount of $15,931,289.

On February 6, 1997, the defendants filed a motion to reargue and/or open or set aside the judgment, for a new trial, and/or for judgment, which the trial court denied. The defendants also filed, on June 17, 1997, a motion for articulation, which the trial court, likewise, denied.

The defendants appealed the judgment to the Appellate Court. The plaintiff filed a cross appeal,[3] challenging the trial court's rejection of the CUTPA claim. We transferred the appeal and the cross appeal to this court pursuant to Practice Book (Rev. 1998) § 65-1, formerly § 4023, and General Statutes § 51-199 (c).[4]

The trier of fact reasonably could have found the following facts. Charles Remington, Wayne Steidle, and Jeannie Leitao, incorporated the plaintiff as a Massachusetts corporation in April, 1987. They sold fitness equipment with a distinctive color scheme and logo, as well as a plan for operating a fitness club for women. The plaintiff's system included everything an owner would need to run a club, including equipment, training, sales and marketing support, and advertising and promotional materials. The plaintiff incorporated in Connecticut on August 17, 1987, and opened a corporate headquarters in Rocky Hill. From its Rocky Hill headquarters, the plaintiff licensed purchasers to use its

[3] The three officers of the plaintiff who were originally involved in this action; see footnote 1 of this opinion; were also parties to the cross appeal. The cross appeal, however, as it pertained to those individuals was subsequently withdrawn.

[4] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

concept, and sold distributorships to investors who gained the exclusive right to sell the plaintiff's products and to sublicense its name within a regional territory.

In October, 1987, prompted by a legal problem regarding the plaintiff's trademark in California, Leitao contacted the law firm of Schatz & Schatz. On October 28, 1987, the plaintiff met with Goldman, a partner at Schatz & Schatz, and Seidl, an associate in the firm. Leitao advised them that she recently had filed a trademark application for the name "Beverly Hills Concepts" in Washington, D.C. Goldman assumed incorrectly that this meant that the plaintiff had a "federally registered trademark," which would have alleviated the need to register as a "business opportunity" pursuant to the Connecticut Business Opportunity Investment Act (act). General Statutes (Rev. to 1987) § 36-503 et seq.[5] He told Leitao that Schatz & Schatz possessed expertise in the field of franchising, and that the firm was well qualified to handle the plaintiff's legal affairs. Goldman also said that he would be involved personally in the firm's representation of the plaintiff.

In fact, beginning in late 1987, Goldman turned the plaintiff's file over to Seidl, a junior associate, and Ira Dansky, a "contract" lawyer not yet admitted to the Connecticut bar. Neither Seidl nor Dansky possessed expertise in the law of franchising and business opportunities. Schatz & Schatz billing records revealed that Goldman spent only about two hours on the plaintiff's matter between December, 1987, and June, 1988.

Before turning the plaintiff's file over to Seidl, Goldman visited the plaintiff's headquarters in Rocky Hill

---

[5] General Statutes (Rev. to 1987) § 36-508 provides in relevant part: "Registration and application by seller of business opportunity. Financial statement. Registration fee. Exemptions. (a) Unless exempted by subsection (e) of this section, any person who advertises, sells, contracts, offers for sale or promotes any business opportunity in this state or from this state must register with the commissioner and file, in a form prescribed by said commissioner, an application . . . ."

and examined its distributorship and licensing agreements and promotional materials. Despite the plaintiff's request for guidelines regarding the sale of its equipment and "system" pending its franchise registration, Schatz & Schatz failed to advise the plaintiff that it was violating the act by selling fitness club packages without first registering with the state banking commissioner. Rather, after analyzing the plaintiff's documents, Goldman told Remington that the question of whether the plaintiff was offering business opportunities within the meaning of the act was a "gray area" of the law.

Recognizing that the plaintiff would need financial statements in order to file its franchise documents, Schatz & Schatz referred the plaintiff to the accounting firm of Coopers and Lybrand (Coopers). Schatz & Schatz advised Coopers, however, only of the financial statements required under federal law. It failed to inform Coopers of the requirements of the act.

In the winter of 1987–88, Seidl began drafting the plaintiff's franchise documents. On February 8, 1988, another Schatz & Schatz associate, who had been assigned the task of researching the franchise registration requirements of fourteen states, including Connecticut, informed Seidl that the plaintiff was not exempt from the registration requirements of the act. That same day, Schatz & Schatz contacted the plaintiff's Washington, D.C., trademark attorney, who confirmed that the plaintiff's trademark application was pending, and that no federal registration had been issued. Under these circumstances, Schatz & Schatz lawyers should have realized that the plaintiff was not exempt from the filing requirements of the act. Yet no one from the defendant law firm apprised the plaintiff of that fact.[6]

---

[6] In fact, also in February, 1988, Dansky advised the plaintiff to merge its Massachusetts and Connecticut corporations, retaining the Connecticut entity. Because Massachusetts has no business opportunity laws and filing requirements, that merger foreclosed a route by which the plaintiff could have curtailed its violation of the act.

In June, 1988, Dansky terminated Schatz & Schatz's representation of the plaintiff, stating that he was concerned that the plaintiff's franchise offering documents overstated its financial position. Shortly afterwards, the plaintiff retained Martin Clayman, an attorney with the firm of Clayman, Markowitz and Tapper, to complete the plaintiff's franchise registration. Within a few weeks, Clayman and his partner, Holly Abery-Wetstone, had prepared an application for the plaintiff to register as a business opportunity in Connecticut. The plaintiff decided not to file the registration documents, however, until its trademark had been approved, an event that its Washington, D.C., attorney had estimated would occur within a few months.

On September 15, 1988, an official acting for the banking commissioner notified the plaintiff that its marketing of franchises violated the act. The plaintiff contacted Clayman and Abery-Wetstone, who began preparing a postsale registration for the plaintiff's previous sales. The plaintiff complied immediately with advice from Abery-Wetstone that it should stop advertising and selling franchises. The plaintiff filed a postsale registration application on December 7, 1988, in an effort to comply with the act. Nevertheless, on June 28, 1989, the banking commissioner issued a cease and desist order and a notice of intent to fine the plaintiff up to $10,000 for each sale made in violation of the act. The commissioner further issued a stop order invalidating the plaintiff's postsale registration. On June 26, 1991, following hearings in September and November of 1989 and May of 1990, the commissioner issued a final cease and desist order, stating that the plaintiff had violated the act repeatedly by selling unregistered business opportunities in Connecticut. This malpractice action followed.

For purposes of this appeal, the defendants do not challenge the trial court's determination that they breached the applicable professional standard of care.

Rather, they raise claims regarding the issues of causation and damages. Specifically, the defendants argue that the trial court improperly: (1) rendered judgment against Seidl on the negligent misrepresentation and breach of fiduciary duty claims based on the same conduct underlying the judgment of malpractice; (2) concluded that the defendants' failure to advise the plaintiff of its violation of the act caused its demise; (3) awarded damages based on lost profits rather than the going concern value of the business at the date of destruction; (4) awarded the plaintiff approximately $15.9 million in lost profits calculated over a period of twelve years; and (5) included prejudgment interest in the damages award.

We agree with the defendants' first and fourth claims. Accordingly, we reverse the judgment of the trial court and render judgment for the defendants.

I

We first examine whether the trial court improperly found Seidl liable for the negligent misrepresentation and breach of fiduciary duty counts. We conclude that the trial court should not have held Seidl, a junior associate at Schatz & Schatz, liable on these counts.

The trial court did not distinguish between the defendants in finding for the plaintiff on the claims of legal malpractice, breach of contract, negligent misrepresentation, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. The defendants now argue that Seidl, a junior associate playing a lesser role in the events that gave rise to the action, should not have been found liable on the negligent misrepresentation and breach of fiduciary duty counts. We agree.

We note first that the defendants do not challenge on appeal the trial court's determination that their failure to register the plaintiff with the banking commission

constituted legal malpractice. Seidl shares the blame for that lapse.

The trial court also reasonably could have found that Seidl had engaged in legal malpractice because, in her position as a junior associate, she failed to seek appropriate supervision. Rule 1.1 of the Rules of Professional Conduct provides that: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." The commentary to rule 1.1 provides in part that a lawyer who lacks relevant experience may "associate or consult with, a lawyer of established competence in the field in question. . . ." Having little experience in franchising, Seidl, therefore, could have rendered competent representation by seeking appropriate supervision. She failed to do so. She testified that she had sent both Goldman and Dansky copies of her work product. Seidl's pursuit of supervision, however, went no further. She stated that she had "assume[d] somebody was . . . watching, taking care of looking at my work." The trial court reasonably concluded that this passivity departed from the applicable standard of care.

Professional negligence alone, however, does not give rise automatically to a claim for breach of fiduciary duty. Although an attorney-client relationship imposes a fiduciary duty on the attorney; see *Matza* v. *Matza*, 226 Conn. 166, 183–84, 627 A.2d 414 (1993); not every instance of professional negligence results in a breach of that fiduciary duty. "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." (Internal quotation marks omitted.) *Konover Development Corp.*

v. *Zeller*, 228 Conn. 206, 219, 635 A.2d 798 (1994). Professional negligence implicates a duty of care, while breach of a fiduciary duty implicates a duty of loyalty and honesty. See *Edwards* v. *Thorpe*, 876 F. Sup. 693, 694 (E.D. Pa. 1995); *Bukoskey* v. *Walter W. Shuham, CPA, P.C.*, 666 F. Sup. 181, 184 (D. Alaska 1987).

Goldman, a partner in Schatz & Schatz, represented to the plaintiff that the firm possessed the necessary franchising experience to handle its legal affairs. Goldman and Dansky, who, although not admitted in Connecticut, held himself out as a partner of the firm, managed the relationship with the plaintiff. Seidl, by contrast, was a junior associate to whom Goldman and Danksy delegated research and drafting responsibilities. Because it cannot be said that Seidl represented that she had superior knowledge, skill or expertise in the field of franchising, nor that she sought the plaintiff's special trust, it was improper for the trial court to conclude that her professional negligence rose to the level of a breach of fiduciary duty.

For similar reasons, the trial court should not have held Seidl liable for negligent misrepresentation. This court has stated: "One who, in the course of his [or her] business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 218, 520 A.2d 217 (1987). At oral argument, however, the plaintiff conceded that Seidl herself had made no false statement of fact. Her presence at a time when a senior attorney made such an inaccurate statement does not suffice to render her liable for negligent misrepresentation.

We conclude, therefore, that the trial court improperly found Seidl liable for negligent misrepresentation and breach of a fiduciary duty. Accordingly, we reverse the trial court's conclusions holding Seidl liable on these two counts.[7]

## II

We turn next to the defendants' claim that the trial court improperly determined that their malpractice caused the demise of the plaintiff. We review a trial court's determination of causation under the clearly erroneous standard. "[O]ur function [on appeal] is not to examine the record to see if the trier of fact could have reached a contrary conclusion." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 14, 664 A.2d 719 (1995). Rather, "it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

In its memorandum of decision, the trial court concluded that the defendants' malpractice had constituted a proximate cause of the plaintiff's failure. Applying the "substantial factor" test of causation, the trial court

---

[7] We note that Seidl was also found liable for legal malpractice. We conclude, however, in part III of this opinion, that the plaintiff failed to prove its damages to a reasonable certainty.

concluded: "The [defendants'] inept legal representation, inordinate delays in completing their work, and . . . fundamental failure to recognize [the plaintiff] as a seller of business opportunities were, as claimed by the plaintiff, substantial factors in causing damage to the plaintiff and this damage, the forced closing of the business, was a natural and foreseeable consequence of the defendants' neglect and incompetence." In support of its determination, the trial court cited, inter alia, portions of the testimony of Harold Brown, the plaintiff's expert on franchising and business opportunities.

The defendants challenge the trial court's conclusion on two grounds. They claim that Brown: (1) was not qualified to state an opinion regarding whether the plaintiff would have been able to make an effective postsale registration had it been notified of its violation in a timely fashion; and (2) based his opinion on faulty assumptions. We need not, however, resolve these issues in order to decide this appeal. Even if we were to assume that the trial court properly determined that the defendants' malpractice had constituted a proximate cause of the plaintiff's failure, we conclude, for the reasons that follow, that the trial court improperly concluded that the plaintiff had established its damages to a reasonable certainty.

III

The defendants' third claim on appeal challenges the trial court's award of damages. The defendants argue that the trial court improperly: (1) concluded that the plaintiff's expert witness was qualified to render an opinion as to the value of the plaintiff; (2) awarded damages based on lost profits rather than the going concern value of the business at the date of destruction; (3) awarded the plaintiff approximately $15.9 million in lost profits calculated over a period of twelve years;

and (4) included prejudgment interest in the damages award. We conclude that: (1) the plaintiff's expert was qualified; (2) unestablished enterprises must be permitted to recover damages for legal malpractice and that a flexible approach in determining those damages generally is appropriate; (3) lost profits for a reasonable period of time may serve as an appropriate measure of damages under certain circumstances; and (4) the plaintiff bears the burden of proving lost profits to a reasonable certainty. As applied to the facts of this case, however, we conclude that the plaintiff has not sustained its burden of proof regarding damages.[8]

We begin with a brief overview of additional facts that are relevant to the correct determination of damages in this case. The plaintiff had been operating for approximately one year at the time it retained the defendants. It therefore had a business track record by which to measure the likely success of its planned franchising operation. As the defendants correctly point out, despite its initial sales of exercise equipment, the plaintiff was in poor financial condition. The plaintiff owed approximately $80,000 in unpaid federal and state payroll taxes and had never paid unemployment taxes, a decision that its own expert witness, Thomas Ferreira, a certified public accountant, characterized as not a good business practice. Significantly, the plaintiff had not filed federal or state income tax returns for 1987, 1988 or 1989. The plaintiff's financial statement, prepared by Coopers, revealed that it was insolvent as of November 30, 1987, and its situation had deteriorated even further by January, 1988. It is particularly telling that the plaintiff had attempted to obtain financing from a number of banks as well as from the Small Business Administration and that it had been rejected by all of these institutions. According to Charles Remington, one

---

[8] Therefore, we need not address the defendants' claim that the trial court improperly awarded 8 percent prejudgment interest in the damages award.

of the plaintiff's officers, this financing was necessary
to the proposed franchising operation. Additionally, the
model franchise opened by the plaintiff in East Hartford
quickly failed. Finally, despite several months of trying,
the plaintiff never sold a single franchise. Moreover, its
own damages expert, Ferreira, characterized the plain-
tiff as a poor credit risk. These facts serve to indicate
that the plaintiff was not financially stable and that its
prospects for earning profits in the future were, at best,
questionable.

## A

We first address the defendants' claim that Ferreira
was not qualified to render an expert opinion regarding
the value of the plaintiff. We conclude that the trial
court did not abuse its discretion in determining that
Ferreira was sufficiently qualified.

"The determination of the qualification of an expert
is largely a matter for the discretion of the trial court."
(Internal quotation marks omitted.) *Oborski* v. *New
Haven Gas Co.*, 151 Conn. 274, 280, 197 A.2d 73 (1964);
see also C. Tait & J. LaPlante, Connecticut Evidence
(2d Ed. 1988) § 7.16.7, p. 179. The trial court's decision
"is not to be disturbed unless [its] discretion has been
abused, or the error is clear and involves a misconcep-
tion of the law." (Internal quotation marks omitted.)
*State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986).

In its memorandum of decision, the trial court noted
that Ferreira had fifteen years of experience as a certi-
fied public accountant, and that he had prepared busi-
ness projections on numerous prior occasions. The
court also noted that Ferreira had prepared the projec-
tions in this case in compliance with the standards of
the American Institute of Certified Public Accountants
and with generally accepted accounting procedures.

The defendants challenge the trial court's determina-
tion on several grounds. They argue that Ferreira was

not properly qualified because he: (1) is an accountant rather than an economist; and (2) lacked prior experience in the personal fitness industry. We disagree.

"Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." Id. "[I]t is not essential that an expert witness possess any particular credential, such as a license, in order to be qualified to testify, so long as his education or experience indicate that he has knowledge on a relevant subject significantly greater than that of persons lacking such education or experience." *Conway* v. *American Excavating, Inc.*, 41 Conn. App. 437, 448–49, 676 A.2d 881 (1996).

The defendants argue that Ferreira was not qualified to make business projections because the plaintiff had introduced no evidence that he was well versed in economic skills such as regression analysis. It is true that "[a]n accounting degree alone should not qualify a witness to testify that a given volume of sales, for example, will continue in the future." 2 R. Dunn, Recovery of Damages for Lost Profits (4th Ed. 1992) § 7.3, p. 443. Nevertheless, we have affirmed the admission of testimony regarding lost profit damages by an accountant who had based his projections on the "standard valuation procedures recognized in the accounting profession." *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 321, 514 A.2d 734 (1986). As noted above, Ferreira had prior experience in making business projections. We conclude that, in this regard, the trial court did not abuse its discretion in allowing him to testify.

The defendants further argue that the trial court abused its discretion in allowing Ferreira to testify

because he lacked prior experience in the personal fitness industry. They reason that Ferreira's lack of industry specific experience rendered him unqualified to make projections regarding the plaintiff's future sales and expenses. Generally, if a proponent of testimony establishes reasonable expert qualifications for a witness, further objections to that expert's testimony go to its weight, not its admissibility. C. Tait & J. LaPlante, supra, § 7.16.7, p. 179. We are not persuaded to abandon this principle in favor of a bright line rule that expert witnesses must possess prior industry-specific experience. Industries may be segmented infinitesimally. Some economists' and accounting professionals' skills may be transferred between industries. Under these circumstances, we conclude that the trial court did not abuse its discretion in concluding that Ferreira was qualified to testify regarding the valuation of the plaintiff's business.

## B

We next address the question of whether lost profits are an appropriate measure of damages for the destruction of a nascent enterprise. The defendants argue that the appropriate measure of damages for the destruction of a business is its going concern value at the time of its destruction rather than lost profits. The plaintiff argues that the present value of a stream of expected future profits is an appropriate way to value a business and that it is therefore an appropriate measure of damages. We conclude that it is proper to award damages for the destruction of an unestablished enterprise and that lost profits may constitute an appropriate measure of damages for the destruction of such an enterprise.

We begin with a brief history of the evolution of the law on the determination of damages with respect to a business that has been destroyed by the conduct of a third party. A principle component of damages in such

a situation is the present value of the profits lost as a result of the defendant's wrongdoing. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 32–33 (noting that plaintiff entitled to recover probable value of business at time of its destruction and that going concern value of business may be calculated based on lost profits). Although the guiding principle of tort law is to compensate parties for harm to their protected interests; W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 1, pp. 5–6; recovery for lost profits has not always been available. The "new business rule" in particular forbade the recovery of lost profits for an unestablished enterprise. See, e.g., *Evergreen Amusement Corp.* v. *Milstead*, 206 Md. 610, 618, 112 A.2d 901 (1955) (holding lost profits not generally recoverable but creating exception for established businesses). "Originally the speculative and contingent nature of profits was regarded as a complete bar to their recovery in any case. Gradually, however, came recognition that difficulties of proof and the speculative nature of profits were not uniform for all situations; and the rigid prohibition has given way to a more flexible requirement of 'reasonable certainty.' " 4 F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 25.3, pp. 502–503. "A common thread running through opinions expressing the liberal standard of proof in lost profit damages cases is that there is really no alternative: [A] [d]efendant will get away with its wrongdoing if the court requires [the] plaintiff to prove damages to the dollar. . . . The wrongdoer has created the problem; its conduct has interfered with [the] plaintiff and caused damages. The wrongdoer cannot now complain that the damages cannot be measured exactly." 1 R. Dunn, supra, § 5.2, p. 314. The former rule forbidding lost profit damages for new enterprises has thus given way to the general view that such damages ought to be recoverable where the likelihood of future profits can be established with reasonable certainty.

The approach taken by the Restatement (Second) of Torts, as it relates to the destruction of a new enterprise, is also instructive in that it places the burden on the plaintiff who is attempting to prove damages for harm to a new enterprise to come forward with specific evidence regarding future profits.[9] The Restatement states that "[w]hen the tortfeasor has prevented the beginning of a new business or the prosecution of a single transaction, all factors relevant to the likelihood of the success or lack of success of the business or transaction that are reasonably provable are to be considered, including general business conditions and the degree of success of similar enterprises. Because of a justifiable doubt as to the success of new and untried enterprises, more specific evidence of their probable profits is required than when the claim is for harm to an established business." 4 Restatement (Second), Torts § 912, comment (d), p. 483 (1979).[10] The Restatement does not place a higher burden on plaintiffs attempting to prove lost profits relative to a new business but, instead, points out that new enterprises must provide specific evidence in order to meet the same burden that applies to established businesses.[11]

---

[9] The Restatement (Second), Torts § 912 (1979) provides with respect to the quantum of proof needed to prove damages generally:

"Certainty

"One to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit."

[10] The Restatement provides that the plaintiff must "[establish] by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit." 4 Restatement (Second), supra, § 912.

[11] The following illustration set forth in the Restatement exemplifies the standard by which a plaintiff must prove lost profits. "A pays B $10,000 for a license to sell in specified territory a new drink, produced and extensively advertised by B. Before a shipment has been made, C tortiously causes B to refuse to make delivery. A is not entitled to substantial damages from C on proof that the gross profit would have been 20 per cent, that other drinks

The Supreme Court of Alabama has stated that "the weight of modern authority does not predicate recovery of lost profits upon the artificial categorization of a business as 'unestablished,' 'existing,' or 'new,' particularly where the defendant itself has wrongfully prevented the business from coming into existence and generating a track record of profits. Instead, the courts focus on whether the plaintiff has adduced evidence that provides a basis from which the [fact finder] could, with 'reasonable certainty' calculate the amount of lost profits." *Super Valu Stores, Inc.* v. *Peterson,* 506 So. 2d 317, 330 (Ala. 1987) (upholding $5 million verdict for breach of contract to open grocery store where plaintiff projected profits of $20 million over fifteen years and defendant conceded that statistical evaluation of future profit, which it had itself generated, was reliable).

In accordance with these principles, we have approved the recovery of lost profits where the defendant has destroyed the plaintiff's opportunity to earn profits in the future. See, e.g., *Westport Taxi Service, Inc.* v. *Westport Transit District,* supra, 235 Conn. 32–33; *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 33, 662 A.2d 89 (1995); *West Haven Sound Development Corp.* v. *West Haven,* supra, 201 Conn. 319. Furthermore, we note that, "[i]n economic theory . . . the current market value of a company is the discounted present value of the estimated flow of future earnings." Note, "Private Treble Damage Antitrust Suits: Measure of Damages For Destruction of All or Part of a Business," 80 Harv. L. Rev. 1566, 1580 (1967). Thus, determining a business' future lost profits is one generally accepted way of calculating its market value at the time of its destruction.

---

have had a ready sale in the same locality, that in other localities large quantities of the same drink have been sold, and that in the past A has been successful in other enterprises." 4 Restatement (Second), supra, § 912, illustration (12), p. 485.

For example, in *Westport Taxi Service, Inc.*, an antitrust case, we stated that "[w]here the plaintiff's business is totally or partially destroyed by [the] defendant's violation . . . damages may be measured by lost goodwill or the going concern value of [the] plaintiff's business." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 32–33. We further explained that "[a] plaintiff injured by an antitrust violation may recover both lost past profits and the probable value of the business [at the time of its destruction]." Id., 33. The trial court in that case calculated the going concern value of the business at the time of its destruction by capitalizing the plaintiff's projected profits over a certain period of time at a given rate of return. Id., 33–34.

Similarly, in *West Haven Sound Development Corp.* v. *West Haven*, supra, 201 Conn. 319, a case involving breach of contract, the trial court allowed a certified public accountant to testify to the value that the plaintiff's restaurant would have attained had the defendant performed its contract obligations. The accountant valued the plaintiff's business by calculating the net present value of its future earnings, using a rate of capitalization appropriate to the restaurant industry. Id., 317. In other words, he "determined the value of the plaintiff's business by estimating future profits, and then by capitalizing those expected profits to their net present value at an appropriate interest rate." Id., 319. We concluded that his "opinion as to the going concern value of the plaintiff's restaurant business before the breach was based on reasonable estimates of lost profits." Id., 321.

For the foregoing reasons, we conclude that lost profits may provide an appropriate measure of damages for the destruction of an unestablished enterprise, and further, that a flexible approach is best suited to ensuring that new businesses are compensated fully if they

suffer damages as a result of a breach of contract, professional malpractice, or similar injuries.

## C

We next consider whether the trial court improperly awarded, the plaintiff approximately $15.9 million in lost profits calculated over a period of twelve years. In challenging the award, the defendants contest the assumptions upon which Ferreira based his projections and the court's acceptance of his choice of a twelve year time span. We conclude that the trial court abused its discretion because the plaintiff did not prove the lost profit damages to a reasonable certainty.

We recognize that "[t]he trial court has broad discretion in determining damages. *Buckman* v. *People Express, Inc.*, 205 Conn. 166, 175, 530 A.2d 596 (1987); *Amwax Corp.* v. *Chadwick*, 28 Conn. App. 739, 745, 612 A.2d 127 (1992). The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. *Beckman* v. *Jalich Homes, Inc.*, 190 Conn. 299, 309–10, 460 A.2d 488 (1983); *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 545, 651 A.2d 1302 (1995)." *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 27–28; see also *Johnson* v. *Flammia*, 169 Conn. 491, 499, 363 A.2d 1048 (1975). "[W]hether the decision of the trial court is clearly erroneous . . . involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole

arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Barbara Weisman, Trustee* v. *Kaspar*, 233 Conn. 531, 541, 661 A.2d 530 (1995).

We are, therefore, constrained to accord substantial deference to the fact finder on the issue of damages. In deciding whether damages properly have been awarded, however, we are guided by the well established principle that such damages must be proved with reasonable certainty. *Gargano* v. *Heyman*, 203 Conn. 616, 621, 525 A.2d 1343 (1987). "Although we recognize that damages for lost profits may be difficult to prove with exactitude; see *Conaway* v. *Prestia*, [191 Conn. 484, 494, 464 A.2d 847 (1983)]; *Burr* v. *Lichtenheim*, 190 Conn. 351, 360, 460 A.2d 1290 (1983); *Humphrys* v. *Beach*, 149 Conn. 14, 21, 175 A.2d 363 (1961); such damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount with *reasonable certainty. Conaway* v. *Prestia*, supra [494]; *Simone Corporation* v. *Connecticut Light & Power Co.*, 187 Conn. 487, 494–95, 446 A.2d 1071 (1982); *Humphrys* v. *Beach*, supra [21]." (Emphasis added.) *Gargano* v. *Heyman*, supra, 621. Consequently, we have permitted lost profits to be calculated by extrapolating from past profits. See, e.g., *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 32–33 (proper to base lost profits award on profits from preceding year); *Humphrys* v. *Beach*, supra, 21 ("[i]n the absence of evidence to the contrary,

the court was entitled to draw the inference that the plaintiff's business would continue to be as profitable as it had been in the year and a half before the fire"). We have stated, however, that the plaintiff cannot recover for "the mere possibility" of making a profit. See *Goldman* v. *Feinberg*, 130 Conn. 671, 674–75, 37 A.2d 355 (1944) (in context of tortious interference claim, plaintiff must show more than that he was "about to" enter into contract and must, instead, show that he "would have" done so). "A damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 28.

In order to recover lost profits, therefore, the plaintiff must present sufficiently accurate and complete evidence for the trier of fact to be able to estimate those profits with reasonable certainty. The trial court in this case, although cognizant of this standard, nevertheless assessed damages based upon assumptions that were not supported by the record. The trial court's determination that the plaintiff would have earned approximately $15.9 million in profits over the course of twelve years had it not been for the defendants' conduct, therefore, constituted an abuse of discretion.

We will first address the defendants' claims regarding the assumptions upon which the plaintiff's expert, Ferreira, based his projections. Ferreira assumed that a substantial number of the people who had purchased toning tables would also have purchased franchises. He also assumed that the plaintiff would sell twenty franchises per year for the first five years and would progressively increase sales until it was selling forty franchises per year by year twelve. The defendants have claimed that these assumptions were speculative and therefore could not have formed a reasonable basis from which to estimate damages with any degree of

certainty. We agree with the defendants and therefore conclude that the trial court abused its discretion in determining that the plaintiff had established lost profits to a reasonable certainty.

The weakness underlying the assumptions challenged by the defendants is that the plaintiff's sales of toning tables, which had been declining, could be extrapolated to predict future success in selling franchises. The testimony indicates that there is no reasonable basis to compare the two products other than the possibility that they might be marketed to the same customer base. The toning table transactions cost from $45,000 to $50,000 per location, whereas each franchise cost $116,500 to $172,500. That figure included a $20,000 franchise fee and $90,000 in equipment, or approximately twice the initial expenditure required for toning table packages. Additionally, a franchise involves a much greater commitment in terms of expenditures, opportunity costs and effort than does the purchase of equipment. Purchasers of toning tables were not required to make any further expenditures. Franchisees, on the other hand, would have been required to pay the plaintiff a monthly service fee of 5 percent of gross revenue, but not less than $349 per month and would have had to contribute 3 percent of monthly gross revenues, but not less than $200, to an advertising fund. It is also significant that the plaintiff, by its own estimate, needed $300,000 in new capital to launch its proposed franchising business and, in its investment proposal, stated that it was seeking to raise between $250,000 and $500,000 for that purpose. Ferreira's projections, however, were based on the assumption that the plaintiff needed only $100,000 to enter the franchise business.

Ferreira's assumption that the plaintiff would, in fact, have sold franchises is also directly contradicted by the record. The model franchise opened by the plaintiff

failed shortly after it began operation. Additionally, the plaintiff attempted for months to sell franchises but was unable to sell even one. Ferreira's reliance on the performance of World Gym Licensing Limited (World Gym) as a model for predicting the plaintiff's future success was also unreasonable. Ferreira himself conceded that World Gym and the plaintiff were not similar. Additionally, he appears to have based his information about World Gym on a magazine article. Although he assumed that the plaintiff would grow at a slower rate than World Gym, Ferreira did not explain how he arrived at the projected rate of sale for the plaintiff's franchises other than to state that he had discounted the rates reported by World Gym. Therefore, even reducing the plaintiff's sales of sixty-five toning tables in a one and one-half year period to a projection that twenty franchises per year would be sold is contradicted by the available evidence of the plaintiff's failed attempts to sell the actual franchises. Moreover, no evidence was presented to support the contention that even the sales of toning tables would continue at their prior rate.

This court and courts of other jurisdictions have looked to a number of factors in evaluating whether the plaintiff has proved lost profits to a reasonable certainty. A plaintiff's prior experience in the same business has been held to be probative; see, e.g., *Kay Petroleum Corp.* v. *Piergrossi*, 137 Conn. 620, 624–25, 79 A.2d 829 (1951) (profits earned by plaintiff in year prior to breach may be extrapolated to time remaining on contract breached by defendant); *Tull* v. *Gundersons, Inc.*, 709 P.2d 940, 945 (Colo. 1985) (trial court improperly excluded evidence of plaintiff's "past profit experience on other projects"); *White* v. *Southwestern Bell Telephone Co.*, 651 S.W.2d 260, 263 (Tex. 1983) (profits earned by plaintiff's florist shop prior to defendant's breach of contract relevant to determination of lost

profits caused by defendant's failure to list plaintiff's business properly in telephone directory); as has a plaintiff's experience in the same enterprise subsequent to the interference. See, e.g., *El Fredo Pizza, Inc.* v. *Roto-Flex Oven Co.*, 199 Neb. 697, 698, 261 N.W.2d 358 (1978) (increased profits earned after faulty pizza oven replaced indicative of profits lost as result of defendant's breach of warranty of merchantability); *Guady* v. *Seaman*, 188 Pa. Super. 475, 477–78, 149 A.2d 523 (1959) (plaintiff's success at different location admissible to show lost profits from defendant's breach of lease); *Ferrell* v. *Elrod*, 63 Tenn. App. 129, 146–47, 469 S.W.2d 678 (1971) (same); *Cook Associates* v. *Warnick*, 664 P.2d 1161 (Utah 1983) (plaintiff's experience at unaffected plant relevant to lost profits projected for affected plant). In jurisdictions that have been faced with assessing damages for the destruction of a new business, the experience of the plaintiff and that of third parties in a similar business have been admitted to prove lost profits. See, e.g., *Lucky Auto Supply* v. *Turner*, 244 Cal. App. 2d 872, 884, 53 Cal. Rptr. 628 (1966) (evidence regarding 48 percent increase in business at other locations admissible to prove loss of profits at affected location where plaintiff testified that other locations were comparable to affected location); *Chung* v. *Kaonohi Center Co.*, 62 Haw. 594, 611, 618 P.2d 283 (1980) (proper to base future profit calculation on experience of third party conducting virtually identical business at same location); *Vickers* v. *Wichita State University*, 213 Kan. 614, 618, 518 P.2d 512 (1974) (approving reliance on experience of others in same line of business); *Ellwest Stereo Theaters, Inc.* v. *Davilla*, 436 So. 2d 1285, 1288–89 (La. App. 1983) (evidence of profitability of other locations in chain of stores owned by plaintiff held admissible to show lost profits where plaintiff testified that variables among locations were similar and that expected profit at unestablished

location was expected to be greater than for existing locations); *Smith Development Corp.* v. *Bilow Enterprises, Inc.*, 112 R.I. 203, 214, 308 A.2d 477 (1973) (evidence of profitability of nearby McDonald's franchises held admissible to show lost profits from tortious interference with establishment of new McDonald's location); cf. *Kenford Co.* v. *County of Erie*, 108 App. Div. 2d 132, 134, 489 N.Y.S.2d 939 (1985), rev'd on other grounds, 73 N.Y.2d 312, 537 N.E.2d 176, 540 N.Y.S.2d 1 (1989) (evidence of profitability and expenses of nearby established domed stadiums inadmissible to prove lost profits for stadium never built where plaintiff failed to establish existing stadiums were comparable and where too many variables existed). In addition, the average experience of participants in the same line of business as the injured party has been approved as a method of proving lost profits. See, e.g., *Vermont Food Industries, Inc.* v. *Ralston Purina Co.*, 514 F.2d 456, 457 (2d Cir. 1975) (average egg production when proper chicken feed used compared with egg production when defendant's deficient feed used). Similarly, prelitigation projections, particularly when prepared by the defendant, have also been approved. See, e.g., *Super Valu Stores, Inc.* v. *Peterson*, supra, 506 So. 2d 330. The underlying requirement for each of these types of evidence is a substantial similarity between the facts forming the basis of the profit projections and the business opportunity that was destroyed.

A review of several cases relied upon by the plaintiff in which jury verdicts based upon lost profits were upheld serves to illustrate the relatively poor evidence of future profitability offered by the plaintiff in the present case. In *Super Valu Stores, Inc.* v. *Peterson*, supra, 506 So. 2d 317, the Supreme Court of Alabama upheld a $5 million jury verdict for breach of a contract to construct and lease a grocery store to the plaintiff. In that case, the plaintiff had introduced evidence that

the store would have generated profits of $20 million over the proposed fifteen year lease term. Id., 326. The statistical studies introduced by the plaintiff to support that contention had been prepared by the defendant and were acknowledged by the defendant to be accurate. Id., 330–31. In the present case, by contrast, the defendant did not prepare the data relied upon by the plaintiff nor did it concede that the figures were reliable.

In *Chung* v. *Kaonohi Center Co.*, supra, 62 Haw. 611, the Supreme Court of Hawaii upheld a jury verdict of $175,000 for the loss of anticipated profits relating to the breach of a contract to enter into a ten year lease for a restaurant. In that case, the projected profits were based on the actual earnings and expenses of the restaurant experienced by the person who eventually contracted with the defendants for the same enterprise. Id., 610–11. It is not reasonable to compare projections based on the actual experience of a business that is identical in nature and in location to the one that the plaintiff in *Chung* had intended to form with the hypothetical projections based on an untried enterprise offered by the plaintiff in the present case.

In *Fera* v. *Village Plaza, Inc.*, 396 Mich. 639, 647, 242 N.W.2d 372 (1976), the Michigan Supreme Court upheld a $200,000 award for lost profits where the plaintiff had claimed that breach of a ten year lease to operate a liquor store would result in $270,000 in lost profits. In that case, the plaintiffs presented several days of testimony from a number of experts in the liquor sales business and from liquor distribution firms to support their claim. In the present case, by contrast, the plaintiff's expert had no experience in the fitness industry and had based his projections on informal interviews and articles in the lay press about the industry.

We note that lack of prior profitability does not *necessarily* prohibit a trial court from awarding future lost

profits, although it serves as a strong indicator that future profits are uncertain. The plaintiff must carry the burden of proving that prior losses will be turned around to provide future gains. In the present case, the plaintiff has failed to come forward with evidence showing, to a reasonable degree of certainty, that it would become profitable.

Finally, we disagree with the trial court's decision to award lost profits over a twelve year period. We agree with the plaintiff that there is nothing inherently improper about allowing damages for lost profits over a twelve year period. What is improper, however, is to award damages over such a long time span when there is no evidence that the plaintiff would have survived for twelve years, let alone that it would have remained profitable for that length of time. In order to remove the assessment of damages from the realm of speculation, it is necessary to tie the award of damages to objective verifiable facts that bear a logical relationship to projected future profitability.

Where the lost business opportunity is grounded in a contract or a lease, it is sometimes appropriate to award damages for a period commensurate with the term of that contract or lease. We have stated that, where the claimed damages are not the result of a breach of contract or lease of express duration, damages for future losses are permitted "as long as they are limited to a *reasonable time* and are supported by the evidence." (Emphasis added.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 33–34 (analogizing future earnings to lost profits). In *Torosyan*, this court approved an award of lost wages for wrongful termination of an implied employment contract. Damages for lost wages were awarded from the date of discharge, in May, 1985, to the end of 1992, which was approximately one year beyond the end of trial. Id., 32. In *Westport Taxi Service, Inc.* v. *Westport*

*Transit District,* supra, 235 Conn. 33–36, this court approved the trial court's damage award consisting of one year of lost profits and the value of the business based on its actual earnings in the year before it ceased operating. Cf. *Olympia Equipment Leasing Co.* v. *Western Union Telegraph,* 797 F.2d 370, 383 (7th Cir. 1986), cert. denied, 480 U.S. 934, 107 S. Ct. 1574, 94 L. Ed. 2d 765 (1987) (lost profit award for ten year period not appropriate where plaintiff failed to demonstrate that it would have survived and remained profitable for that length of time).

A survey of cases permitting the recovery of lost profits over long periods of time reveals that, in these cases, the recovery period frequently is based on contracts or lease terms of fixed duration. See, e.g., *Super Valu Stores, Inc.* v. *Peterson,* supra, 506 So. 2d 317 (breach of contract to lease and operate grocery store for fifteen years); *Chung* v. *Kaonohi Center Co.,* supra, 62 Haw. 594 (breach of contract to enter into ten year lease for fast food restaurant); *Fera* v. *Village Plaza, Inc.,* supra, 396 Mich. 639 (breach of ten year lease for liquor store). In the present case, by contrast, the choice of a twelve year time span appears quite arbitrary. The example case study prepared by the American Institute of Certified Public Accountants that was introduced by the plaintiff, and noted by the trial court in its memorandum of decision, was based on a proposed twelve year contractual agreement, and was therefore not comparable to the present case. The time span applied in the present case was not tied to any objective facts that reasonably could be construed as supporting the plaintiff's claim that the sale of fitness center franchises would have become profitable and would have remained so for twelve years. We conclude, therefore, that the trial court abused its discretion in failing to limit the recovery of lost profits to a reasonable time period.

We recognize that our decision that the plaintiff failed to prove damages means that the defendants, whose malpractice caused the plaintiff's harm, escape virtually unscathed. "Injury is the illegal invasion of a legal right; damage is the loss, hurt, or harm which results from the injury; and damages are the recompense or compensation awarded for the damage suffered. 22 Am. Jur. 2d [Damages] § 1 [1988]. Ballentine's Law Dictionary (3d Ed. 1969) p. 303." (Internal quotation marks omitted.) *DiNapoli* v. *Cooke*, 43 Conn. App. 419, 427–28, 682 A.2d 603, cert. denied, 239 Conn. 951, 686 A.2d 124 (1996). In this case, the defendants argued that Ferreira's testimony failed to remove the question of damages from the realm of speculation and, consequently, the plaintiff failed to satisfy its burden of proof on the issue of damages. This is a case in which we reverse the judgment not for lack of "mathematical exactitude"; *Falco* v. *James Peter Associates, Inc.*, 165 Conn. 442, 445, 335 A.2d 301 (1973); but because the plaintiff failed to provide sufficient evidence.[12] This outcome is a direct result of the plaintiff's choice of evidence.

## IV

Finally, we address the cross appeal briefly. Although we conclude that the plaintiff has failed to prove damages to a reasonable certainty, we nevertheless address the plaintiff's CUTPA claim. General Statutes § 42-110g (a) "affords a cause of action to '[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment

---

[12] Generally, proof of a legal injury entitles a plaintiff to, at least, token or nominal damages even if no specific actual damages are proven. "Nominal damages mean no damages. They exist only in name and not in amount." (Internal quotation marks omitted.) *Sessa* v. *Gigliotti*, 165 Conn. 620, 622, 345 A.2d 45 (1973). To recover more than nominal damages, it was incumbent upon the plaintiff to prove the extent of those damages for the actions of the defendants. This the plaintiff failed to do, and, accordingly, it is entitled only to nominal damages. Because, however, the plaintiff does not seek nominal damages, we do not remand the case for such an award.

of a method, act or practice prohibited by section 42-110b . . . .' " *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 638, 698 A.2d 258 (1997). " '[L]oss' has a broader meaning than the term 'damage.' " *Catucci* v. *Ouellette*, 25 Conn. App. 56, 60, 592 A.2d 962 (1991). As a consequence, "[u]nder CUTPA, there is no need to allege or prove the amount of the ascertainable loss." *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981), on appeal after remand, 192 Conn. 252, 470 A.2d 1216 (1984). The plaintiff's failure adequately to prove damages, therefore, does not dispose of the CUTPA claim. We, therefore, take this opportunity to reaffirm our prior holding that professional malpractice does not give rise to a cause of action under CUTPA.

This court has stated that, in general, "CUTPA applies to the conduct of attorneys." *Heslin* v. *Connecticut Law Clinic of Trantolo & Trantolo*, 190 Conn. 510, 521, 461 A.2d 938 (1983). The statute's "regulation of the conduct of any trade or commerce does not totally exclude all conduct of the profession of law." (Internal quotation marks omitted.) Id. Nevertheless, we have declined to hold that "every provision of CUTPA permits regulation of every aspect of the practice of law . . . ." Id., 520. We have stated, instead, that, "only the entrepreneurial aspects of the practice of law are covered by CUTPA." *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 34, 699 A.2d 964 (1997). Accordingly, as in the health care context, "we conclude that professional negligence—that is, malpractice—does not fall under CUTPA." Id.

We conclude, therefore, that CUTPA does not apply to the facts of this case. We, therefore, affirm the judgment of the trial court on this issue.

The judgment with respect to the appeal is reversed and the case is remanded with direction to render judg-

ment for the defendants; the judgment is affirmed with respect to the cross appeal.

In this opinion NORCOTT, PALMER and E. O'CONNELL, Js., concurred.

PETERS, J., dissenting. I respectfully dissent. I agree with part I of the majority opinion concerning the liability of attorney Jane Seidl, one of the defendants, but I disagree with parts II and III concerning the liability of the defendant law firm and the other individual defendants.[1]

As a matter of principle, the majority opinion subscribes to the position advanced by the defendants that, no matter how egregious and protracted their professional misconduct, it is more appropriate for this court to take an unnecessarily rigorous view of proof of damages than to provide relief for the plaintiff,[2] a client whom the defendants have put out of business. I disagree with so constricted a view of professional and fiduciary responsibility. Clients aggrieved by the misconduct of their attorneys are entitled to rely on courts to recognize that such misconduct may impair not only the clients' business but also the clients' ability to prove, with complete precision, the extent to which their business has been impaired. Having substantially created the problem, the defendants now should not be allowed to walk away from all responsibility for its solution.

Secondarily, as a matter of appellate practice, the majority opinion departs from the deference ordinarily accorded to a trial court's discretionary role as the

---

[1] In addition to Jane Seidl, the defendants were Schatz & Schatz, Ribicoff & Kotkin, Stanford Goldman and Ira Dansky.

[2] Beverly Hills Concepts, Inc., is the plaintiff to which this opinion refers. The trial court's determination that the individual plaintiffs named in the complaint lacked standing to maintain the action has not been challenged on appeal.

finder of facts. The trial court found the plaintiff's evidence of causation and damages to have been proved sufficiently to justify a large amount of damages. Even if the court reasonably might have found to the contrary, its view of the evidence should not be set aside lightly. This is not a case in which the plaintiff produced no evidence in support of causation and damages. The weight to be assigned to disputed evidence ordinarily is determined by the trial court and not an appellate tribunal.

## I

Two predicate facts contained in the record have greater significance in this case than the majority opinion acknowledges. One relates to the trial court's findings of liability and the other relates to the defendants' posttrial filings.

The trial court's findings about the defendants' misconduct were not limited to a finding that they had committed legal malpractice. The court also found that the plaintiff had proved the defendants' breach of contract, their negligent misrepresentations, their breach of their fiduciary duties and their breach of the contractually implied covenant of good faith and fair dealing. On appeal, the defendants have challenged the propriety of these findings only with respect to causation and to damages. Accordingly, they do not challenge the findings that their misconduct amounted not only to malpractice and to negligent misrepresentation but also to a breach of the fiduciary duty that they owed to the plaintiff.

After the trial court had rendered its judgment, the defendants filed a considerable number of posttrial motions.[3] What is notable about those filings is what

---

[3] On February 6, 1997, the defendants filed a motion to reargue or open or set aside the judgment, for a new trial, or for judgment, which the trial court denied. The defendants also filed, on June 17, 1997, a motion for articulation, which the trial court, likewise, denied.

they do not include. The defendants maintain that they are entitled to a judgment on the merits without any recovery whatsoever for the plaintiff. At trial and on appeal, they contend that, although they are not blameless, they are not liable. Regardless of the breadth of their misconduct, regardless of the devastating impact of that misconduct on the plaintiff, the defendants maintain that they owe the plaintiff not one cent. On their theory, the defendants would have had as strong an objection to a judgment awarding the plaintiff $1000 as to one awarding it nearly $16 million.

Having identified the additional facts that are relevant, I next analyze the legal issues on appeal. I would resolve several of these issues differently than the majority resolves them.

## II

I disagree with the majority opinion's endorsement of the defendants' exculpatory arguments. By not deciding the issue of causation, the majority opinion undermines the connection between causation and damages that underlay the trial court's judgment. By discrediting the damages expert whom the trial court found credible, the majority opinion denigrates the fact-finding function of the trial court. I would affirm the judgment of the trial court on both issues.

## A

I begin with the defendants' claim that the trial court improperly determined that their malpractice caused the plaintiff's demise. Although the majority opinion sidesteps this issue, I would resolve it in accordance with the reasoning of the trial court.

We review a trial court's determination of causation under the clearly erroneous standard. "[O]ur function [on appeal] is not to examine the record to see if the trier of fact could have reached a contrary conclusion."

(Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 14, 664 A.2d 719 (1995). Rather, "it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Citation omitted.) *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

In its memorandum of decision, the trial court concluded that the defendants' malpractice had constituted a proximate cause of the plaintiff's failure. Applying the "substantial factor" test of causation, the trial court concluded: "The [defendants'] inept legal representation, inordinate delays in completing their work and . . . fundamental failure to recognize [the plaintiff] as a seller of business opportunities were, as claimed by the plaintiff, substantial factors in causing damage to the plaintiff . . . . [T]his damage, the forced closing of the business was a natural and foreseeable consequence of the defendants' neglect and incompetence." In support of its determination, the trial court cited, inter alia, portions of the testimony of Harold Brown, the plaintiff's expert on franchising and business opportunities.

The defendants challenge the trial court's conclusion on two grounds. They claim that Brown: (1) was not qualified to state an opinion regarding whether the plaintiff would have been able to make an effective

postsale registration as a seller of business opportunities had it been notified of its violation in a timely fashion; and (2) based his opinion on faulty assumptions. I disagree with both claims.

The first issue that the defendants raise warrants little discussion because it was not properly preserved at trial. The defendants not only did not challenge Brown's qualifications or testimony at trial; Practice Book § 60-5, formerly § 4061; *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 184 n.13, 646 A.2d 195 (1994); but expressly conceded his qualifications as an expert in the areas of franchising and business opportunities. The defendants likewise expressly conceded, at trial, that Brown properly could state his opinion on whether the defendants' malpractice was "in any way a cause of the action taken by the banking commissioner." Finally, the defendants themselves elicited Brown's opinion that, but for various factors, the plaintiff "would have" or "probably could have" achieved a settlement with the banking commissioner. The defendants' belated challenges to Brown's qualifications have no merit.

The defendants' second issue with respect to causation is their claim that the trial court improperly relied on Brown's testimony because Brown's testimony was premised on faulty assumptions. The defendants argue that Brown: (1) stated incorrectly that the plaintiff, as a company that had been in business less than one year, automatically would have been able to file a less burdensome "review-level" accounting statement in order to comply with the requirements of the Connecticut Business Opportunity Investment Act (act); General Statutes (Rev. to 1987) § 36-503 et seq.;[4] and (2) assumed

[4] General Statutes (Rev. to 1987) § 36-508 provides in relevant part: "(a) Unless exempted by subsection (e) of this section, any person who advertises, sells, contracts, offers for sale or promotes any business opportunity in this state or from this state must register with the commissioner and file, in a form prescribed by said commissioner, an application . . . ."

mistakenly that the plaintiff would have been able to survive a departmental recission order. I disagree.

In legal malpractice cases, as in other cases of negligence, we have utilized the substantial factor test as the appropriate standard for a trier of fact's determination of proximate cause. *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky,* supra, 231 Conn. 182. "Under the substantial factor doctrine, the trial court could accept the plaintiff's evidence of causation without requiring that the defendant's alternative theories be expressly and entirely discredited." *Ferri* v. *Pyramid Construction Co.,* 186 Conn. 682, 687, 443 A.2d 478 (1982). "The plaintiff is not required to show only one possible theory of causation, negating all others." *Slepski* v. *Williams Ford, Inc.,* 170 Conn. 18, 22, 364 A.2d 175 (1975). Moreover, "a plaintiff may rely on circumstantial evidence and expert testimony to prove causation." Id.

These cases support the trial court's determination of probable cause in the circumstances of this case. The trial court stated: "It is the opinion of this court that if the defendants had recognized the need to register [the plaintiff] as a seller of business opportunities and had properly assisted the plaintiff in effecting a registration, the plaintiff would never have suffered the severe adverse consequences of failure to register which were imposed by the Department of Banking [department] and which caused the demise of its business." The trial court further stated that the defendants' malpractice "was the proximate cause of the failure of the [plaintiff] since it was a substantial factor in bringing about the demise of [the plaintiff]."

The defendants challenge the trial court's determination of proximate cause by attacking what they characterize as mistaken assumptions underlying Brown's opinion on causation. They argue first that the plaintiff did not establish, with certainty, how the department

·would have exercised its discretion under the version of the act in effect during the relevant time period. General Statutes (Rev. to 1987) § 36-508 (b).[5] They also argue that, even if the plaintiff had succeeded in persuading the department to permit a postsale registration, it was unlikely that the plaintiff would have been able to comply with the sanction that the department probably would have imposed.

I am unpersuaded that the defendants' criticisms of Brown's testimony are accurate as a matter of fact. Even assuming their accuracy, however, we should not disturb the trial court's finding of proximate cause. Whether the plaintiff would have succeeded in persuading the department to act favorably on its belated application cannot be dispositive in light of the trial court's determination that the defendants' misconduct foreclosed the option of pursuing a timely postsale registration. Moreover, the trial court was entitled to find that the plaintiff failed, not because of sanctions that the department might have imposed but because of the

[5] General Statutes (Rev. to 1987) § 36-508 (b) provides in relevant part: "The seller shall file with the commissioner (1) a balance sheet, income statement and statement of changes in financial condition of such seller as of a date not more than four months prior to the filing of the registration statement (2) a balance sheet of such seller, an income statement and statement of changes in financial position for the most recent fiscal year audited by an independent public accountant or an independent certified public accountant and (3) a balance sheet and income statement and statement of changes in financial position for the prior two fiscal years reviewed by an independent certified public accountant who provides an opinion stating that he is not aware of any material modifications that should be made to the financial statements in order for them to be in conformity with generally accepted accounting principles. . . . The commissioner may waive the requirement for audited statements for sellers who have been in business for less than one year and who have not previously had such certified audits, provided the unaudited financial statements are reviewed by an independent certified public accountant who provides an opinion stating that he is not aware of any material modifications that should be made to the financial statements in order for them to be in conformity with generally accepted accounting principles. . . ."

penalty actually levied as a result of the defendants' misconduct.

The trial court was not required to rule out every other possible cause of the plaintiff's failure in order to determine that the defendants' misconduct was, in fact, a substantial factor in the company's demise. See *Ferri* v. *Pyramid Construction Co.*, supra, 186 Conn. 687; *Slepski* v. *Williams Ford, Inc.*, supra, 170 Conn. 22. I would affirm the judgment of the trial court on this issue.

## B

I turn next to the issue of damages. I disagree with the majority opinion's reasoning in the circumstances of this case. As does the majority opinion, I reject the defendants' claims that: (1) Thomas Ferreira, the plaintiff's expert, was not qualified to render an opinion concerning the value of the plaintiff's business; and (2) the trial court improperly awarded damages based on the plaintiff's lost profits. I would reject, as equally unpersuasive, the defendants' remaining claims of impropriety with respect to damages.

In addressing this issue, the majority opinion starts out with an accurate description of the rocky state of the plaintiff's finances when it came to the defendants for legal representation. To my mind, it is not surprising that start-up companies, in the first years of their operation, would have a difficult time making ends meet. It is not far-fetched to assume that Steve Jobs, when he started Apple Computers, might have had difficulty in obtaining financing for so untested an idea as a personal computer. At that time, how could he have projected future profits with analytic precision? In negligence actions, defendants take their plaintiffs as they find them and cannot excuse their own misconduct because of a plaintiff's preexisting infirmities. See, e.g., *Schafer* v. *Hoffman*, 831 P.2d 897, 902 (Colo. 1992); see also 4

F. Harper, F. James & O. Gray, Torts (2d Ed. 1986) § 20.3, pp. 123–30. The time for the defendants to have considered the financial circumstances of the plaintiff was when they agreed to represent the plaintiff, not after they assured its demise. Accordingly, the trial court reasonably might have assigned little or no probative weight to the evidence of the plaintiff's straitened financial circumstances.

I also disagree with the majority opinion's reasoning with respect to the remaining issues concerning damages. These issues are whether the trial court improperly: (1) awarded the plaintiff approximately $16 million in lost profits calculated over a period of twelve years; and (2) included prejudgment interest in the damages award. I would reject both of the defendants' claims.

The trial court based its award of damages largely on the testimony presented by Ferreira, the plaintiff's expert witness. The majority opinion accepts the defendants' arguments that, even if Ferreira was a qualified expert and properly used a lost profits measure of damages, he provided an insufficient basis for his award of lost profits over a period of twelve years and relied on mistaken assumptions about the plaintiff's future business prospects. On this theory, the majority opinion concludes that the trial court's award was an abuse of its discretion. In light of the high degree of deference that an appellate court must afford to a trial court's findings on damages; *Westport Taxi Service, Inc.* v. *Westport Transit District*, supra, 235 Conn. 27–28; I would reach a contrary conclusion.

1

I turn first to whether twelve years was a reasonable time frame for projecting future lost profits. I am persuaded that the trial court did not abuse its discretion in accepting a valuation of the business that projected lost profits over a twelve year period.

"The amount of a damage award is a matter peculiarly within the province of the trier of fact . . . . The size of the verdict alone does not determine whether it is excessive. The only practical test to apply to this verdict is whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the [trier of fact] was influenced by partiality, prejudice, mistake or corruption." (Internal quotation marks omitted.) *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, supra, 231 Conn. 183–84.

The defendants urge us to adopt a rule that damages based on a twelve year projection of future lost profits inherently are so speculative as to be contrary to law. They point to cases from other jurisdictions in which courts have declined, in the circumstances therein, to award projected lost profits for periods of time deemed too speculative. See, e.g., *Olympia Equipment Leasing Co.* v. *Western Union Telegraph Co.*, 797 F.2d 370, 383 (7th Cir. 1986) ("[t]here are no grounds for thinking [the plaintiff] could have survived in this highly competitive market for 10 years while earning a 191 percent, or even a 42 percent, rate of return on its investment").

The majority opinion rejects the defendants' bright line approach, but decides that damages over a twelve year period are inappropriate without "objective verifiable facts" to prove that the plaintiff would have survived and would have remained profitable for that period. In the circumstances of a plaintiff in the early days of an uncertain new venture, this harsh requirement inevitably will preclude any award of damages. If it is the misconduct of the defendants that is a substantial cause of a plaintiff's early demise, and the reason for its inability to make a more precise showing of damages, I disagree with requiring the level of proof of damages demanded by the majority.

Lost profits must be proved by a reasonable certainty and limited to a reasonable time period. "Reasonable

certainty of proof is all that is required, and mere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 33, 662 A.2d 89 (1995). Similarly, "[t]he development of the law has been to find damages for lost profits of an *unestablished* business recoverable when they can be adequately proved with reasonable certainty." (Emphasis added.) 1 R. Dunn, Recovery of Damages for Lost Profits (4th Ed. 1992) § 4.2, p. 280.

"It has been suggested that profits cannot reliably be forecast for any business beyond a ten year period, and that consequently this is the maximum for which they should be awarded. But the span of time for which profits can be predicted varies from business to business according to a great many factors; this makes any standard less flexible than a 'reasonable' time seem unwise." Note, "Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business," 80 Harv. L. Rev. 1566, 1577 (1967). Such a flexible approach might take into account factors including: (1) a business' past profit record, if any; (2) "the experience and ability of its management"; (3) "the quality and goodwill of its product"; (4) "the firm's comparative standing among its competitors"; (5) "the future of the particular industry as a whole"; (6) the behavior of comparable or competitor "yardstick" firms; and (7) "the average lifespan of the type of business destroyed . . . ." Id.

I note, moreover, that other jurisdictions have awarded future lost profits projected over a period of ten or more years, even to unestablished businesses. In *Super Valu Stores, Inc.* v. *Peterson*, 506 So. 2d 317, 330 (Ala. 1987), the Alabama Supreme Court affirmed

an award of damages to a new business based on future lost profits projected over a fifteen year time period. See *Chung* v. *Kaonohi Center Co.*, 62 Haw. 594, 610–11, 618 P.2d 283 (1980) (affirming award of lost profits projected over ten year period for restaurant that never commenced operation); *Fera* v. *Village Plaza, Inc.*, 396 Mich. 639, 641–45, 242 N.W.2d 372 (1976) (affirming lost profit damages awarded to unestablished business on basis of defendant's breach of ten year lease).

A flexible approach is best suited to ensuring that new businesses are compensated fully if they suffer damages as the result of professional malpractice, breach of contract and failure to comply with fiduciary duty. "In recognition of the fact that the plaintiff's difficulty in quantifying his [or her] damages often flows directly from the defendant's breach," our cases state that we require "that degree of proof of damages which the facts permit, but no more." *Bead Chain Mfg. Co.* v. *Saxton Products, Inc.*, 183 Conn. 266, 278–79, 439 A.2d 314 (1981). As the Oregon Supreme Court has stated, "the data and evidence presented by plaintiff was all that could be expected in the circumstances of this case. To hold otherwise would be tantamount to holding that the defendant could breach this particular contract with impunity." *Welch* v. *U. S. Bancorp Realty & Mortgage Trust*, 286 Or. 673, 705, 596 P.2d 947 (1979).

2

The majority opinion's principal reason for overturning the trial court's award of damages is that, in its view, certain of Ferreira's underlying assumptions were so speculative as to make the trial court's acceptance of his projection an abuse of its discretion. The majority opinion agrees with the defendants' argument that Ferreira's expert opinion was flawed because he assumed that: (1) the plaintiff would have sold franchises; (2) the

thirty-five people who had purchased fitness equipment from the plaintiff would have converted their operations into franchises; and (3) the plaintiff would have sold at least *twenty new franchises each year for twelve years,* and would have derived additional revenues from the sale of "super centers." I am not persuaded that the trial court abused its discretion in accepting Ferreira's opinion.

In this situation, as in the antitrust context, "[t]he vagaries of the marketplace usually deny us sure knowledge of what [the] plaintiff's situation would have been in the absence of the defendant's . . . violation." (Internal quotation marks omitted.) *Westport Taxi Service, Inc.* v. *Westport Taxi District,* supra, 235 Conn. 28. Accordingly, "[a] damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence." (Internal quotation marks omitted.) Id. "The reasonableness of the assumptions underlying the plaintiff's damage theory is determined by the trier of fact." Id. In fact, some courts "have refused to find damage evidence insufficient unless there was no basis for critical assumptions made by the trial court." Id.

In this case, Ferreira testified that the plaintiff already had sold about sixty-five locations, nationwide, through licensing arrangements, in a period of about one and one-half years. Ferreira projected a slower growth rate of twenty locations per year for the plaintiff's franchise sales. He explained that purchasing a franchise required "more of a commitment" for buyers than purchasing a business opportunity, including paying the franchise, royalties and advertising fees. Accordingly, in order to ensure a conservative projection, he estimated sales of twenty franchises per year, the actual growth rate of World Gym Licensing Limited. He checked this assumption with at least two people who had been associated

with the sales of the plaintiff's business locations, and he concluded that it was reasonable, if not conservative.

As for the role of the "super centers" in Ferreira's projection, Ferreira estimated the plaintiff's revenues based, in part, on the probable equipment sales to future clubs under the plaintiff's name. The plaintiff's clubs initially were about 2000 square feet and were designed to serve women exclusively. The plaintiff planned, however, to expand its clubs to a larger floor plan of 4000 or 5000 square feet, the super center format, serving both men and women.

In projecting equipment sales to the plaintiff's clubs, Ferreira based his estimates on figures contained in the plaintiff's Uniform Franchise Offering Circular (circular). Ferreira projected equipment sales on the basis of the expected average sales to clubs with the super center floor plan, as outlined in the circular. According to Ferreira's interviews and research, the super center was the style of club that the plaintiff had planned for the future, and, in fact, the format that had become more popular in the industry. Again, to be conservative, Ferreira estimated $90,000 in initial equipment sales, the lower end of the range of average expected equipment sales to super centers listed in the plaintiff's circular.

On the basis of this record, I would conclude that the trial court, in the exercise of its discretion, reasonably might have found that the plaintiff had adduced sufficient evidence to support Ferreira's assumptions. The fact that the record is thin would have supported the trial court's decision to the contrary, but it does not make it clearly erroneous for the court to find as it did. See *Westport Taxi Service, Inc.* v. *Westport Taxi District*, supra, 235 Conn. 28; see also Practice Book § 60-5, formerly § 4061.

3

The defendants also argue that the trial court improperly included prejudgment interest in the damages

award. This is an issue that the majority opinion does not reach. I would conclude that the trial court's ruling was proper.

The defendants argue that the trial court improperly awarded 8 percent prejudgment interest on the damages award. We have examined the portions of Ferreira's testimony cited in the defendants' brief, however, and conclude that his mention of the 8 percent interest rate referred to the adjustment he made for the time-value of money in calculating the value of the business itself. As discussed both in the majority opinion and in this dissent, one method of determining the worth of a business is to calculate the present value of its future income stream. Accordingly, Ferreira's interest calculation was, in fact, consistent with his method of calculating the value of the business on its date of destruction.

Accordingly, I would not reverse the trial court's award of damages to the plaintiff. Although the trial court was required to make a close call in a number of instances, that is the role that is assigned to trial courts. In making close calls, the trial court was entitled to give some consideration to the role that the defendants' misconduct played in the difficulties that the plaintiff encountered in proving its damages. The majority opinion finds no impropriety in the legal standards upon which the trial court relied. Cf. *Unkelbach* v. *McNary*, 244 Conn. 350, 367, 710 A.2d 717 (1998). Rather, in concluding that the trial court's close calls were improper, the majority opinion relies solely on its view that the defendants adduced insufficient evidence of damages. In these circumstances I see no reason to depart from our usual practice of affirming a trial court's findings of fact unless they are clearly erroneous. See *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995) (" '[t]o the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous' "); see

also Practice Book § 60-5, formerly § 4061 ("[t]he court may reverse or modify the decision of the trial court if it determines that the factual findings are clearly erroneous in view of the evidence and pleadings in the whole record").

In conclusion, the majority opinion, in my view, reaches out to reverse a trial court judgment on grounds that are far from compelling. We condone professional misconduct if we discharge these defendants of all liability to a plaintiff that has tried, as best it could, to quantify the loss that the defendants' misconduct has caused it to suffer. Such a result, it seems to me, turns the law of professional responsibility on its head. Those members of the legal profession who engage in egregious and protracted misconduct bear the responsibility, fiscally as well as morally, for the harm that they have caused. It is our responsibility to search for ways to reenforce that professional commitment.

Accordingly, I respectfully dissent.