[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
STATEMENT OF THE CASE
The above captioned cases were consolidated for trial and arise out of a construction contract under which Barry White was to construct a one family residence for Robert Van Rhijn and Dorothyann Van Rhijn on property they owned in Middletown.
The contract was executed on August 16, 1999 with a contract price of $324,600. The completion date was originally agreed upon as March 1, 2000 but the owners agreed to an extension to May 1, 2000.
The owners paid an advance of $32,460 on August 25, 1999 and though mechanic's lien waivers were required under the contract, White did not obtain any until after he had received and exhausted the first progress payment.
When the second progress payment inspection approached, the owners found work had not progressed as they all had agreed it would. The inspection was rescheduled to March 3, 2000 and the owners applied to the CT Page 13092 lender for the payment.
While this was being processed, a subcontractor called the owners to complain that he had not been paid. They soon learned of other unpaid subcontractors and one, A.H. Harris, filed a mechanic's lien.
The owners then stopped payment on a check for a change order and told their lender not to disburse funds premised on the March 3, 2000 inspection.
White then obtained lien waivers dated March 8, 9, and 10. The waivers did not represent all the suppliers and subcontractors who had money due. The owners then pressed White for an accounting of the funds advanced to date and the parties actually sat down with counsel on March 14 in an attempt to resolve the issues.
This attempt failed and the project slowed perceptibly. White then walked off the project and notified the owners of that fact on March 27, 2000.
After the parties parted company, White brought suit against the property owners in a three count complaint. Counts two and three were dismissed at trial and only the first count, sounding in breach of contract survives.
The property owners suit against the Whites is in thirteen counts. The first twelve counts deal with the contract, while Barbara White, wife of the builder, is joined in the last count with an allegation that the conveyance of the husband's interest in the family residence to his wife was fraudulent.
Trial started on April 19, 2001 and suffered several interruptions including one caused by the Whites filing a petition in bankruptcy court. After that court removed the automatic stay, trial resumed on June 15, 2001. Briefs followed on July 2.
 DISCUSSION I
The Case of Barry White vs. Robert and Dorothyann Van Rhijn
 The allegations by Barry White are that the owners willfully breached the contract by:
 "(a) refusing to timely schedule the second inspection CT Page 13093 by the defendant's construction lender, which was a prerequisite to a disbursement; (b) refusing to disburse the second draw upon completion of the required inspection; (c) seeking to offset the second payment with baseless claims relating to the construction site; (d) refusing to acknowledge the agreement of the parties that the plaintiff was to pay himself for work actually performed by him on the defendant's resident; and (e) insisting that full reimbursement for the cost of windows supplied by the defendants was to be taken from the second draw rather than only the percentage allowed by the construction lender, with the balance to be reimbursed at the end of the project."
The evidence as to the circumstances surrounding the second disbursement refutes the allegations in paragraphs a, b, and c above.
Though the bank inspection scheduled for February 29, 2000 was cancelled by Mr. Van Rhijn, because the agreed upon "milestones" in the construction had not been reached, he immediately rescheduled an inspection for March 3, 2000, three days later.
While he argues that the inspection report (Exhibit NN) indicates that 46.5% of the total for specific items had been completed, White overlooks the fact that the report noted incomplete work for which payment should not be made — masonry, for example. Other work had not even begun.
Nevertheless, the second disbursement was being processed when on March 7 a subcontractor called the owners and advised them he was owed money dating back to before the first disbursement. He threatened to file a mechanic's lien. In fact, other subcontractors had not been paid and one, A.H. Harris, filed a lien on the same day.
Apparently, at this time, White began to collect lien waivers, but the first progress disbursement was made and accepted by White on his promise to give waivers to the owners. These were not delivered as promised.
White's handling of these waivers is of particular significance because the contract for the construction (Exhibit D) contains this language:
 "No payment of any portion of the purchase price will be due unless approved by Owner's construction lender and Contractor represents that it has reviewed lender's general conditions for disbursement and accepts said conditions as part of this agreement, CT Page 13094 specifically including, but not limited to, mechanic's lien waivers and completion requirements. Owner agrees to provide Contractor with a ten percent (10%) advance of first draw for materials and Contractor shall provide Owner with suitable waivers and invoices at the time of said payment. 10% advance shall be due and payable upon execution of this agreement. Contractor will not begin work until 10% advance is paid."
Exhibit D, Addendum ¶ 11.
Notwithstanding this language and the schedule of disbursements which he agreed to, White testified at trial that he entered into separate "arrangements" with his suppliers and major subcontractors by which he agreed to pay for labor and materials provided in the early phases of the contract with the proceeds of the later progress payments.
These "arrangements" were not revealed to the owners and they had no idea of their potential exposure to the filing and foreclosure of mechanic's liens.
The arguments advanced by White to justify this procedure and to suggest he was not obligated to obtain waivers lack support in the evidence, in the normal construction business practices and common sense.
The claim that White was only legally obligated to "consider" A.H. Harris at the time prior to his leaving the project (February 28 through March 27, 2000) is a glaring example of his lack of understanding of what his practices had created. (White brief, page 8).
White's claims in paragraph d are specious and inaccurate at best. Nor does he specify how the owners' "refusal to acknowledge the agreement of the parties that the plaintiff was to pay himself. . . ." served to breach the contract.
In fact, White drew quite liberally from the owners' payment and substantial expenditures were made for his general use. The court has examined the computation of the owners and agrees with the figure of $48,277.36 "for purposes other than his direct costs for material and labor" on this project. (See, Van Rhijn brief, page 13).
Finally, in support of paragraph e, the plaintiff White indulges in some speculation about what he could have done if the second progress payment had been made and the window credits were applied as he felt they should have been. CT Page 13095
This disbursement has been discussed above. It never occurred because the work had not progressed and the subcontractors had not been paid. This allegation has no substance.
The plaintiff in the case of White v. Van Rhijn, CV00-04385405, has not sustained his burden and judgment may enter for the defendants.
 II
The defendants herein, the property owners, have interposed two counterclaims against the plaintiff builder. They both center around White's having filed a mechanic's lien against their building site in the amount of $231,000 after he stopped working on the project.
In the first counterclaim, the allegation is that a false statement was made with malice against the title of the property. The ascribed motive was to coerce the owners into compromising their position.
The second counterclaim alleges the lien was invalid and White ignored the owners' demand to release it within 30 days. They seek damages pursuant to Conn. General Statute § 49-51.
White testified that his lien was for the balance due on the contract, though it was not even half completed. He included in that amount the amounts due on subcontractors' liens. He admitted refusing to remove the lien upon demand.
The lien (Exhibit Y) states it is for services rendered and materials furnished in the construction, commencing August 16, 1998 and ending March 27, 2000.
The contract was not executed until August 16, 1999 so the commencement date is incorrect. By his own statement, it did not represent "services rendered and materials furnished," and White knew he was not entitled to that amount.
The court concludes that judgment should enter for the defendants on both of the counterclaims.
The lien of the plaintiff Barry White is found to be invalid and is ordered discharged in accordance with Section 49-51 (b).
In accordance with Section 49-51 (a), the court finds the lien was filed without just cause and will hear the parties postjudgment to determine the damages to be assessed and/or a reasonable attorney's fee. CT Page 13096
 III The Case of Van Rhijn vs. White A. Count One
This is a breach of contract claim based in part on the clause dealing with mechanic's liens and waivers.
 "No payment of any portion of the purchase price will be due unless approved by Owner's construction lender and Contractor represents that it has reviewed lender's general conditions for disbursement and accepts said conditions as part of this agreement, specifically including, but not limited to, mechanic's lien waivers and completion requirements. Owner agrees to provide Contractor with a ten percent (10%) advance of first draw for materials and Contractor shall provide Owner with suitable waivers and invoices at the time of said payment. 10% advance shall be due and payable upon execution of this agreement. Contractor will not begin work until 10% advance is paid."
Exhibit D, Addendum ¶ 11.
While admitting he failed to provide the owners with lien waivers, the defendant Barry White denies that the language quoted above so obligates him. He offers the surprising explanation to the effect that he was aware the early progress payments would not enable him to pay suppliers and subcontractors, so he arranged with them to forego payment till later on in the project. And, he did not pay them with the early payments. of course, the net effect of this bizarre arrangement was to have the owners pay under the false impression that the work they thought was paid for was still due and owing and they were exposed to the filing of liens.
When we look to Mr. White's use of the funds he collected from the owners, it is obvious that he was using the owners as a personal piggy bank to carry his business and his household.
The 10% advance of the "first draw for materials" called for in paragraph 11 was in the amount of $32,460. Before he started to work on the project, he paid himself $7,460 for his labor on the project. (He did not keep a record of the time he spent on the job).
Of the sums advanced by the owners prior to White's abandoning the CT Page 13097 job, over $48,000 or about 41% was used by White for his own purposes. Over $2,000 in checks were drawn to "Cash" and White lacked any support for his claim that these were for the Van Rhijn project. Over $3,000 was spent on equipment which would become White's and was not part of this project.
Though the second progress payment had been expected in January of 2000, progress was slow and a bank inspection was delayed until February 29. The owners again found little progress and cancelled that inspection, rescheduling it for March 3 on White's insistence.
This payment was being processed when the owners were contacted by a subcontractor who had not been paid for work done prior to the first payment. On March 7, A.H. Harris filed its lien, by which time the owners learned of other subcontractors and suppliers who had not been paid. The owners were now exposed to additional lien filings in addition to any funds they advanced to White. (Conn. Gen. Statutes § 49-53 (f) and § 49-36 (c).
White, meanwhile collected the first lien waivers he had obtained since December — but he never submitted them to the owners nor did he submit his own.
While this recitation is sufficient to substantiate the conclusion that White breached his contract, the owners also introduced evidence to show that the work was not progressing as contemplated, the site was not properly protected and maintained, and the agreed upon housekeeping and maintenance standards were ignored.
For example, the contractor was responsible for the preparation, grading and placement of the long driveway running from the public highway to the home itself.
Though White treated the owners' concerns over this item as a further annoyance, the evidence is indicative of a poorly planned effort with no concern for the site, the future expense to restore it properly, and its use in the actual construction. Even White admitted an area of the driveway was impassable. Thus, deliveries were made to the street line and smaller vehicles had to be used to reload and truck material to the actual building site.
The condition contributed to the pasture being torn up, and it appears little regard was had for the environment.
These factors contributed to the delays of which the owners complained. Frequently, they said, little or no work was being done and CT Page 13098 based on the inspection report of March 3, 2000, there was little likelihood that this project would have been completed by the date in the contract, May 1, 2000.
The testimony about the appearance of the home site, the use of the site as a public latrine and the sporadic progress is strongly indicative of a project that had no direction or control and was floundering. In fact, the evidence strongly suggests that White did not have the experience nor the capability to take on and successfully complete a project of this size and complexity.
A subcontractor left a large digger on the site where it remained at the time of trial and its owner has refused to remove it.
Typical of the shameful treatment accorded these plaintiffs is the loss they incurred by the "repossession" of the bricks for which they paid Mr. White. As the result of a change order, the plaintiffs paid Mr. White an additional $12,625 for a specialty brick. The unused portion was repossessed by the supplier after a conversation with White, with White receiving a credit of $4,169.83. The owners later had to pay the supplier an additional $749.42 to obtain the bricks because White owed that balance to the supplier.
Damages for the plaintiffs will be treated in a subsequent section.
 B. Count Two
This count sounds in unjust enrichment. However, that doctrine is not applicable here where there is a contract. It has been partly performed, and it is enforceable.
This count is dismissed.
 C. Count Three
This count is directed at defective work or work left in an unworkmanlike condition. The court accepts the evidence of Damiata Contractors and finds the plaintiffs incurred an expense of $14,000 to correct these items.
The masonry and chimney defects in particular reflect shoddy and careless workmanship.
Judgment may enter for the plaintiffs, but the damages incurred will be considered in the section addressing damages. CT Page 13099
 D. Counts Four and Five
In these counts the plaintiffs seek to recover their attorney's fees and punitive damages for the alleged fraudulent representations set out in Count 5. They allege in Count 4 that those representations were also made negligently.
In the court's view, the actions complained of had to have been made knowingly and with an awareness that they would be relied upon by the plaintiffs and they would act on that reliance. Such tortious acts cannot be both negligent and fraudulent. (Citations omitted). Judgment for the defendant may enter on Count 4.
In considering Count 5, the court looks to Kilduff v. Adams, Inc.,219 Conn. 314 (1991), our Supreme Court reiterated the essential elements of an action in fraud. They are:
 (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury.
Id., at 329.
These elements must be proven by clear and satisfactory evidence, though the damages in a fraud case may be proven by only a preponderance of the evidence. Kilduff, at 330.
In paragraph 11 of the addendum to the contract, the defendant White represented that he accepted the terms it contained, specifically the necessity for mechanic's lien waivers and the completion requirements. He also acknowledged that the 10% advance from the owners on the first progress payment was for materials.
As noted in Section III A, supra, he immediately proceeded to draw against those funds for his own general purposes. White's explanation was that he thought the 10% advance was for general start-up purposes.
His explanation for not providing lien waivers was that he had already decided to postpone the payment of suppliers and subcontractors and had them agree to hold off filing liens. Yet, he told these plaintiffs that he would deliver waivers to them — something he didn't do. Actually, he didn't obtain all the required waivers — despite receipt of the advance and then the first payment. CT Page 13100
He neglected to advise the owners of their exposure to foreclosure actions and six liens have been filed up to the time of trial.
His admission at trial that he signed the contract believing that the lender's schedule of payments would not cover the initial project costs is also disturbing, because the owners were unaware that the project was on shaky grounds from the start.
On several occasions, the owners were told waivers were forthcoming. Yet, in late February when the second payment was in process, White had obtained no additional waivers and none were procured until March.
It is clear to this court that White entered into this contract with the intent to mislead these plaintiffs, that he continued to mislead them in order to profit personally, that the plaintiffs relied on his representations and acted on them to their detriment.
Judgment may enter for the plaintiffs on the fifth count. Damages on this count will be dealt with in a subsequent section.
 E. Count Six
The plaintiffs allege a violation of the duty of good faith and fair dealing by the defendant White with respect to the contract.
The court agrees there has been such a violation by virtue of the behavior of White as set out in Counts 1-3, 10 and 11 and judgment may enter for the plaintiffs.
The damages resulting are found to be subsumed in the counts noted above.
 F. Counts Seven and Eight
The plaintiffs in these counts allege conversion and civil theft of building materials by O G Industries in that its agents "repossessed" the specialty bricks on the job site. However, O G is not a party to this action and White has denied he gave permission for them to enter onto the premises and remove the bricks.
This claim then is best dealt with in the court's treatment of Count One, since White received a credit from O G for this material. Though the circumstances suggest it, there is insufficient evidence to find O 
G acted as White's agent.
Judgment may enter for the defendant Barry White on these counts. CT Page 13101
 G. Count Nine
This count involves allegations of a breach of fiduciary duty owed the plaintiffs by White in that he used the funds he received from the plaintiffs and failed to pay suppliers and subcontractors.
The court finds this count proven and judgment may enter for the plaintiffs. However, the damages issue will be addressed in the CUTPA counts, nos. 10 and 11.
 H. Counts Ten and Eleven
In these counts, the plaintiffs request punitive damages and attorney's fees for violations of CUTPA, Connecticut General Statutes § 42-110a.
The court finds the defendant Barry White committed acts which were unfair and deceptive in the conduct of his trade. The specific acts so found include:
 1. Entering into the contract with the intent to ignore or violate its terms;
 2. Failing to use earmarked funds to pay suppliers and subcontractors;
3. Promising to obtain lien waivers;
4. Neglecting to obtain them;
5. Converting funds received for the project to his own use;
 6. Failing to safeguard and maintain the site and improvements as contracted for;
7. Permitting a subcontractor to abandon a digger on the premises;
 8. Profiting from a supplier's "repossession" of material paid for by the plaintiffs; and
 9. Filing under oath a mechanic's lien in an amount he knew to be excessive.
The defendant Barry White admitted he did business in Madison and Middletown under the name of "B. White Construction" without filing trade name certificates in those towns. CT Page 13102
These are per se violations of Section 35-1 of the General Statutes, which violations are by that section deemed to be unfair trade practices and further CUTPA violations.
Judgment may enter for the plaintiffs on these counts. Punitive damages and attorney's fees will be addressed in the section dealing with damages.
 I. Count Twelve
Except for the actions of O G Industries, the plaintiffs have not specified how they were injured by the trespasser complained of in this count.
The count is duplicitous as to the O G action covered by Counts 7 and 8 and the other "trespasser" has not been identified.
This count is dismissed.
 J. Count Thirteen
On the same day he terminated his participation on this project, Mr. White conveyed all of his right, title and interest in his residence to his wife, the defendant Barbara White.
In this count, the plaintiffs allege this transfer was fraudulent and seek to have it set aside so as to make it subject to execution of any judgment obtained against the defendant Barry White.
The statutes we are dealing with includes Section 52-552e:
 Transfers fraudulent as to present creditors. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his CT Page 13103 ability to pay as they became due.
 (b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."
This transfer was made without consideration and came shortly after the parties had met with their lawyers in an attempt to salvage the project. This attempt failed so White knew that litigation was virtually a certainty. He was also aware that suppliers and subcontractors had not been paid and claims could be asserted against him.
From the testimony of the defendants and the evidence produced by the plaintiffs, it was obvious that the residence conveyed was the major asset of the defendants and that they were in all likelihood insolvent after the transfer.
The defendants argue that this transfer is not subject to the provisions of Section 52-552e because the definition of "transfer" in Section 52-552b, Definitions, (12), refers to an "asset" or "interest in an asset".
The defendants then make the quantum leap to the definition of "asset" (2) in said section, where it is stated that the term asset does not include property "to the extent it is encumbered by a valid lien" or exempt under "nonbankruptcy law". CT Page 13104
The court interprets this language as merely preserving the validity and survival of valid liens.
The defendants engage in the torturous process of compiling the value of liens and exemptions, deducting that total from their valuation of the property and concluding there is only a nominal net figure remaining of Mr. White's equity. They also suggest a bankruptcy exemption.
As to the latter, the court notes there has been a prejudgment attachment against this property long before the bankruptcy.
The claim of modest equity is of no relevance, particularly since it assumes the court should accept appraisal of value offered by the defendants. The court does not accept that figure and in fact finds the appraiser's testimony suggestive of a much higher value.
There is no merit to these arguments of the defendants. The defendant Barry White, having made false representations, engaged in deceptive business practices, and aware that the plaintiffs, suppliers and subcontractors would soon be involved in extensive litigation, made a transfer designed to further defraud the plaintiffs in violation of the Uniform Fraudulent Transfer Act.
Judgment may enter for the plaintiffs against Barry and Barbara White and the transfer of March 27, 2000 whereby Barry White transferred his right, title and interest to 10 Doe Lane, Madison to Barbara White is declared void as to the plaintiffs.
 K. Damages
The defendant White has not responded in his brief to the specific damage claims of the plaintiffs except to deny liability for them in discussing the individual counts.
The court will address the components of the plaintiffs' damage claims in the order they are presented in their brief
1. Replacement Contract
Having found the builder breached the contract, the court has examined the exhibits relating to the costs of completing the project. This includes the $14,000 required to correct defective work. The court accepts the plaintiffs' computation of $40,539.96 as accurate and adopts that figure as representing a proper element of their total damages.
2. Delay Costs
CT Page 13105
The claim includes the total value of their mortgage payments on the house they lived in until the project was completed. That figure is not broken down as to principal, interest, and taxes. The portion reducing this indebtedness would have been recovered when that house was sold. On the evidence presented, this item is disallowed.
The need to maintain the pasture while the project was competed by the second builder is a reasonable expense in view of the owners' testimony as to the use to which the property would be put. The claimed sum of $1,500 is allowed.
Because of the unavailability of their new house and grounds, the owners had to board their horse at a cost of $6,275. This is found to be a proper element of damages, occasioned by the delay.
An additional damage claim occasioned by the delay in the project completion was testified to by Mr. Van Rhijn. He had planned to board horses he had treated or was treating. He said he had lost $21,600 he would have earned had he been able to start this boarding operation on schedule.
Lost profit damages for new enterprises are recoverable where the likelihood of future profits can be established with reasonable certainty. Beverly Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48, 64 (1998).
The court finds this item of damages to have been proven. Mr. Van Rhijn was established in his field, he had prior experience, he had an appropriate site upon which to operate, and the defendant offered no rebuttal to his testimony.
3. Additional Costs
The court finds these to be valid claims except that the treble damages requested for the conversion of brick (Count 8) having been denied, that item is disallowed. The value of the brick, $4,169.83 and the O G deposit, $749.72 are allowed. Similarly, the costs of correcting the driveway problems are allowed: gravel, $631; shale $1,114; and the fee of the surveyor, $102.50.
The court will also award the sum of $1,000, the estimate given to remove the excavating machine left on the property by Michael Camarota, a subcontractor. Were he a party to this action, the court would deal directly with him, but Mr. White certainly had an obligation to insure that this item was not left there in the first place and to see to its CT Page 13106 removal once he decided to abandon the project.
In summary, judgment may enter for the plaintiffs to recover of the defendant Barry White as follows:
Replacement Contract $40,539.96
Delay Costs 29,375.00
Additional Costs 7,767.05
Total $77,682.01
These damages are found to be applicable in toto to each of those counts in which judgment was rendered for the plaintiffs: Counts 1, 5, 10 and 11. The damages considered for Counts 3, 6, and 9 are found to be subsumed in the total award.
The court will hear the parties post judgment on the issues of interest, punitive damages, and attorney's fees. The plaintiffs are entitled to their taxable costs on both files.
Finally, the court having found that these plaintiffs have incurred costs to this point in excess of amount due to Barry White, there is no lienable fund to which any mechanic's lien may attach.
By the Court, Anthony V. DeMayo, J.T.R.