[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON THE MERITS OF THE CLAIMS AND COUNTERCLAIM
The above-captioned action was tried to the court after withdrawal of the claim for trial by jury. At the commencement of the trial, the plaintiff withdrew Counts Nine and Ten of the complaint. The defendant withdrew its second counterclaim. The parties have filed post-trial briefs and reply briefs.
The plaintiff, Co-Options, Inc. ("Co-Options") claims that it had an CT Page 2239 agreement with the defendant, News America Marketing In Store, Inc. ("News America"), to participate in a marketing project in 2000, 2001 and 2002 and that News America failed to fulfill its obligations under that agreement.
The plaintiff's causes of action against the defendant, as pleaded in its amended complaint dated June 22, 2002, are as follows:
 Count One — breach of express contract to jointly develop, sell and execute a program known as New Product Showcase in 2001 and later;
 Count Two (in the alternative) — breach of implied contract to jointly develop, sell and execute a program known as New Product Showcase in 2001 and later;
 Count Three (in the alternative) — promissory estoppel based conduct intended to induce reliance and actual reliance by plaintiff;
 Count Four — breach of implied covenant of good faith and fair dealing with regard to contract alleged at Count 1;
 Count Five — violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stats. § 42-110a et seq.;
Count Six — intentional misrepresentation;
 Count Seven (in the alternative) — negligent misrepresentation;
Count Eight — "innocent misrepresentation".
The defendant has asserted as its first counterclaim a claim that Co-Options owes it $30,000 pursuant to a separate and unrelated project known as "Got Milk?" Specifically, News America alleges that Co-Options agreed to pay it $30,000 in commissions by June 30, 2000. Co-Options, by counsel, acknowledged this debt in open court but took the position that it would be offset by amounts owed to Co-Options by News America under the claims alleged in Co-Options' complaint.
Findings of fact
CT Page 2240
Co-Options is a Connecticut corporation, located in Darien, which is engaged in the business of designing, selling and executing promotional sampling and coupon programs in which the manufacturers of products ("brands") cooperate in joint programs with each other and retailers. Such joint or co-operative ventures help brands reach consumers to encourage purchase of their products. Co-Options puts together packages of samples or sets of coupons for brands, apparently to increase consumer interest in the multiple products presented and to provide such exposure to brands at lower cost than if each brand undertook its own project of providing samples and coupons. Co-Options also designs and executes what it calls "custom" programs for individual brands or manufacturers without the feature of cooperation with other brands.
Co-Options is a small company, started by people with experience in marketing functions with other employers. It has been in existence since 1994. Its founder, president and sole shareholder is Brian Sockin. Sockin and the other management employees of Co-Options had experience with and contacts among brands but not among retail establishments, such as supermarket chains. Co-Options has never employed more than ten people.
News America is a large company with offices located in Norwalk. The plaintiff's claims arise from a transaction with News America's in-store sampling division, which performs sampling programs that build on News America's contacts both with brands and with retailers, including supermarket chains. That division is not a separate corporation. News America has other divisions not involved in the claims herein.
In 2000, Co-Options and News America's in-store sampling division participated together in a project known as "Got Milk?" Their efforts in this joint endeavor included preparation of packs of samples of products and of coupons to be displayed in supermarkets participating in this campaign, which was related to an advertising campaign sponsored by milk producers. Many of the documents presented in evidence with regard to the plaintiff's claims mention the Got Milk? project or its details, and it is necessary to distinguish communications about this project from those concerning the project that is the subject of the plaintiff's claims in this suit.
In July 1999, Janet Grottalio[1] of Co-Options approached executives in News America's in-store sampling division with the idea of a joint undertaking to combine live sampling, sample packs and coupons for new products from various brands for supermarkets to present to shoppers. The project was to be known as New Product Showcase. Co-Options was unable to pursue this idea on its own because it lacked contacts with supermarket chains and the capacity to do "wet sampling." "Wet sampling" is the marketing device of puffing people in stores to hand shoppers samples of CT Page 2241 items, for example, slices of a new cheese spread on a cracker. "Dry sampling," by contrast, consists of handing or otherwise distributing a packaged free sample to the shopper. Some supermarkets charge brands an access fee to do sampling in their stores; others do not.
When it began the Got Milk? project in 1997, Co-Options did not undertake the task of signing up the retailers in whose stores samples and coupons were distributed. Instead, Co-Options collaborated with a consultant from Tulsa, Oklahoma, who signed up the retailers in return for a share of the revenues. As of 1999, Co-Options had developed some contacts with the dairy managers in stores that had participated in the Got Milk? program and it was able to continue that program into 1999-2000; however, it lacked the contacts with corporate executives of grocery store chains necessary to pursue the New Product Showcase program.
Lacking a workforce to perform wet sampling at stores, Co-Options was able to pursue its New Product Showcase idea only by joining forces with an in-store sampling company that had the capacity to do wet sampling or by paying another company to sign up retailers and manage a sampling work force, as Co-Options had done in the Got Milk? project.
Co-Options decided that the former approach offered the best prospects for profitability. In July 1999, Grottalio met with William Fasano, a senior vice-president of business management at News America who had responsibility for the in-store sampling division. Grottalio proposed that Co-Options and News America work together to sign up both brands and retail stores for New Product Showcase, dividing the work, the costs and the profits. After News America signed a confidentiality agreement concerning the concept that Co-Options was about to disclose to it, representatives of the parties met and Co-Options described its New Product Showcase idea and its proposal that News America participate not as a supplier of services, as it had in Got Milk?, but as a joint venturer. Fasano designated Kimberly Kiner, Director of Business Development at News America, to continue the discussion of the project with Grottalio and Sockin of Co-Options. Between October 1999 and May 2000, Sockin, Grottalio, Fasano and Kiner exchanged numerous emails discussing possible features of a collaboration on New Product Showcase. (Exs. 5, 6, 7, 8, 9.) Co-Options salespeople, especially Eileen Wong, began to talk about the program to brand manufacturers to try to determine whether there would be interest in participating.
Fasano found at first that the sales staff at News America was not interested in participating in selling the program to retailers and brands, and he asked Kiner to try to interest Co-Options in an arrangement by which News America would share profits without CT Page 2242 participating in sales, limiting its role to the performance of the in-store sampling and some coordination, as it had in the 1999 phase of the Got Milk? program. He suggested that Kiner stall discussions with Co-Options in the hope that News America's sales team, which was headed by another executive, could be persuaded to participate. (Ex. 13.)
Grottalio and Kiner discussed the terms of the transaction; and on May 9, 2000, Grottalio sent Kiner a modified proposal. (Ex. 21.) In that faxed proposal, Grottalio offered the following terms:
 Per my voice mail, here are the spreadsheets with the idea that [News America] assumes 75% of risk/profit for the demos, and Co-Options assumes 75% of risk/profit for the packs. Costs on these are rough and averaged, so they may vary once we agree in principal and get down to actuals. . . .
 In addition, Co-Options would manage and contract with brands on the pack portion and the coop coupon booklet portion, and News America would manage and contract with brands on the demo portion. News America's demo personnel would also be responsible for one per customer distribution of the packs. . .
 If you should decide that you do not want to move forward with a commitment, we will explore all vendor options and sell this program on our own.
On May 23, 2000, Kiner sent an email to Grottalio and Sockin and Co-Options notifying them that News America had held "internal meetings on the subject of New Product Showcase" and that "NAM [News America] agrees to be a "partner' with Co-Options in the program, committing to dedicate all resources necessary to sell, manage and execute all aspects of the program (where applicable)." Kiner further stated the following terms of the agreement incorporating the provisions set forth in Grottalio's fax dated May 19, 2000:
 * This partnership agreement would be based on NAM assuming 75% of the risk/profit for the Live Sampling portion of the program, while Co-Options assumes 75% of the risk/ profit for the Take-home Pack and Coupon Booklet program elements.
* These financial assumptions are based on NAM managing and executing the Live Sampling event, including distribution of the Take-home packs and CT Page 2243 Coupon Booklets (one per customer) and Co-Options managing, fulfilling, producing and shipping the Take-home packs, Coupon Booklets and any/all "New Product Showcase" POS materials.
 * This agreement assumes that NAM would manage and contract with brands on the Live Sampling portion, and Co-Options would manage and contract with brands on the Take-home pack and Coupon Booklet portions of the program.
 * This agreement is also based on a initial program scope (April 2001) of 2,500 target stores, 2 days executed each, for a total of 5,000 store days (to limit the risk associated with a new program launch).
(Ex. 27.) In her memo, Kiner stated "Now that we have come to an agreement in principal (sic), we need to get the wheels in motion for selling and executing this program as soon as possible." She enumerated "next steps" for both News America and Co-Options to perform.
Kiner sent copies of this e-mail to Fasano, who never communicated to Co-Options any negation of Kiner's acceptance on behalf of News America of Co-Option's offer to enter into the transaction. News America put its employees to work on the program. In June 2000, Sue Reinis, the vice-president/group sales manager at News America was preparing a joint presentation format for News America and Co-Options sales people to use to convince brands and retailers to participate in the New Product Showcase program. The materials she prepared included the corporate logos of both Co-Options and News America and contained the features reflected in the Kiner email of May 23. (Ex. 45.) In July 2000, News America circulated a bulletin to its employees announcing its participation in the New Product Showcase project. (Ex. 42.) On August 3, 2000, Kiner sent a News America sales executive, Mark Thomas, a memo to be provided to the News America sales staff for use in trying to sign up retailers to hold New Product Showcase events in their stores. (Ex. 48.)
News America prepared and printed large numbers of "sell sheets" to be used by its sales staff and Co-Options' sales staff in describing the program to brands and retailer. Kiner approved the placement of a listing for the program under News America's name in a trade publication known as Promo. That listing appeared in the September 2000 edition of Promo. (Ex. 71.)
By August 9, 2000, Eileen Wong and Rhonda Kugelman, who worked for CT Page 2244 Co-Options, had contacted dozens of brand manufacturers concerning participation in the planned New Product Showcase events to be held in supermarkets in April 2001. Wong and Kugelman traveled to Battle Creek, Michigan, Chicago, Cincinnati, Los Angeles, San Francisco and other locations to solicit participation in the program. By August 9, 2000, three brands had sent in reservations for items. A reservation in a category served to hold a space for the brand's product and alert Co-Options and News America not to pursue samples of other brands in that category in the same marketing event. Other brands had expressed interest in participating; some had expressed interest in live sampling; and some had expressed interest in having coupons included in the handouts. As of that date, however, no brands had actually signed a contract agreeing to participate and to pay a particular price for participating in the April 2001 program.
By August 9, 2000, several hundred stores in the Kroger supermarket chain had agreed to have New Product Showcase events at their stores in April 2001.
During the summer of 2000, News America was engaged in negotiations with another marketing concern, Sunflower Group, to sell the assets of News America's in-store sampling division to Sunflower. Fasano was aware in July 2000 that a sale was possible; Kiner was unaware of it. No representative of News America told anyone at Co-Options about the possibility of a sale until August 9, 2000, when Fasano told Sockin and Grottalio that the sale was indeed taking place. On that date, News America ceased its participation in the New Product Showcase project. Fasano suggested that Sockin try to interest the purchaser of the News America sampling division, Sunflower, in the project.
Co-Options had proposed a written contract written in formal language to memorialize the parties' agreement concerning the New Product Showcase venture. Sockin sent News America a draft in early February 2000. After Kiner confirmed the essential terms of the arrangement in an email dated May 23, 2000, the parties continued to work on the New Product Showcase project. They occasionally made reference to the progress of drafts of a written agreement; however, they did not ever sign a written agreement but proceeded with the project on the basis of the terms stated in the May 2000 emails (Exs. 21, 27). News America did not return any draft of a written agreement to the plaintiff until August 10, 2000, after it had already decided to sell the sampling division to Sunflower. On that date, News America sent Co-Options a marked-up counterproposal. The court finds that the references to the need to decide some contract terms must be read in the context that News America knew that it would not be participating in New Product Showcase because of the pending sale, and that the sudden emphasis on the written agreement proceeded from an CT Page 2245 effort to disavow the existence of the agreement reflected in the May 23, 2000 communication of consent to basic terms.
By a faxed letter dated September 13, 2000, Sockin contacted the person at Sunflower whom Fasano had said was the likely contact and proposed that Sunflower take over the role News America had agreed to with regard to the New Product Showcase project. (Ex. 85.) The defendant objected to the proffer into evidence of Sunflower's response. Co-Options never reached any agreement with Sunflower to assume News America's role in the program. Co-Options did not have any other prospects for participation on the same basis as News America. and it had told the one supermarket chain that had agreed to participate that the New Product Showcase event would take place in its stores in April 2001. The plaintiffs' witnesses testified convincingly that as of August 9, 2000, Sunflower was the only other in-store sampling firm that could potentially have taken over News America's role for the April 2001 project. Co-Options chose not to pursue the alternative of abandoning the approach to which News America had agreed and instead hiring a vendor to perform the in-store sampling features for a fee. The plaintiff had calculated that structuring the project on the latter basis instead of the joint basis to which News America had agreed would expose the plaintiff to greater financial risks with less likelihood of profit.
Plaintiff's claims
Count One — Breach of contract
Proof of a breach of contract requires proof of an agreement to which both parties have assented. Bridgeport Pipe Engineering Co. v. DeMatteoConstruction Co., 159 Conn. 242, 246 (1970); Biller Associates v.Peterken, 58 Conn. App. 8, 12, cert. granted on other grounds,254 Conn. 914 (2000). An agreement is enforceable if the parties have reached a mutual understanding that is definite and certain regarding the essential terms. Ubysz v. DiPietro, 185 Conn. 47, 51 (1981); Augeri v.C.F. Wooding Co., 173 Conn. 426, 430 (1977); LR Realty v. ConnecticutNational Bank, 53 Conn. App. 524, 534 (1999). Whether a contract is definite enough to enforce is a question of fact. Augeri v. C.F. WoodingCo., supra, 173 Conn. 430-31; Harry A. Finman Son, Inc. v. ConnecticutTrust Trailer Service Co., 169 Conn. 407, 409 (1975). As the facts set forth above indicate, though the parties had not yet signed a formal written agreement, they had exchanged writings which contained all the salient, essential terms of their agreement, and both parties proceeded in reliance on the existence of an agreement m the manner set forth above.
News America suggests that only Kim Kiner had agreed to the joint CT Page 2246 project and that she was not authorized to bind News America to a contract. The court finds that the facts belie this assertion. When Kiner communicated News America's agreement and terms to the plaintiff, she sent a copy to William Fasano, the defendant's senior vice-president of business management. He did nothing to suggest that Kiner was not authorized to communicate News America's agreement or to deny that News America had in fact agreed to participate on the terms indicated in the May 27 email. In June 2000, Fasano received copies of emails in which Kiner and Grottalio outlined the next steps to be taken to pursue the project. Members of the defendant's sales team also received this email, indicating that they had been participating in the planning for execution of the project. Fasano asked Kiner to present the project at a sales meeting. On the basis of pricing and cost details furnished to News America by the plaintiff, Kiner and others at News America, including Mark Thomas, put together a highly detailed description of the arrangement for the defendant's senior management (Ex. 44) for presentation to the sales staff Kiner credibly testified that she was authorized by William Fasano and his superior, Dominic Porco, president of the defendant's marketing division, to commit the defendant to participation in the May 23 email. In its company bulletin, the defendant announced to all its employees that News America was engaged in the New Product Showcase project. The facts amply support the conclusion that Kiner acted on behalf of the defendant and with authority to bind the defendant to an agreement when she told the plaintiff on May 23, 2000, that the defendant would participate and the terms to which it agreed. News America conducted itself in a manner that confirmed the existence of an agreement, incurring the expense of printing sell sheets and deploying sales personnel on the project.
News America asserts that some features of the arrangement had not been stated in Kiner's email or in later discussions between representatives of the parties and that these items were so important to the transaction that their absence constitutes a failure to reach agreement on the essential terms of the agreement. While the proposed written agreement contains terms on some details that are not made clear in discussions or email, this court finds that the parties had reached agreement on the terms that were essential: the allocation of cost and profit, the division of the responsibility for the major facets of the project, the number of stores to participate, and a date for the initial iteration of the program. Kiner was authorized to proceed only with the April 2001 event, and she told Grottalio in a telephone call that News America was agreeing to participate only in that event and not in any future events.
By agreeing to bear the costs of particular parts of the project, each participant acted on its own knowledge of what those costs would be, and the terms of the agreement did not require either party to share the CT Page 2247 costs of the parts to be performed by the other. Accordingly, there was no need to specify costs in the agreement. In prior exchanges of information, Grottalio and Kiner had already set the charges, and Kiner and Thomas included these figures in the description of the proposed joint program that they presented to the defendant's senior management.
The court finds that by a series of communications the parties agreed to the salient features of their arrangement. Though they discussed further details and though the plaintiff pressed for a written agreement that would extend the defendant's commitment to additional dates, none of these matters could properly be characterized as essential.
The plaintiff has proved that it had entered into a sufficiently definite contract with the defendant for a jointly executed sampling program to take place in April 2001. The plaintiff has not proved that the defendant agreed to participate in any additional programs after that date. As Grottalio testified, both companies had decided to assess the success of the April 2001 project before deciding whether to perform further iterations. (Tr. 1/30/02, p. 41-42.)
News America has alleged as a special defense that any contract that resulted from the exchange of faxes and emails and oral agreements was unenforceable pursuant to the statute of frauds, Conn. Gen. Stat. §52-550. News America agreed to participate only in the project scheduled for April 2001 and did not commit itself to any subsequent repetitions. The contract thus involved performance within one year, and § 52-550
does not bar the plaintiff's action for breach.
The defendant unmistakably breached its agreement with the plaintiff by refusing to perform its obligation to participate in the April 2001 iteration of New Product Showcase after selling the assets of its in-store sampling division to Sunflower, since after that sale News America refused to perform any of the tasks it had agreed to pursue. The plaintiff claims that News America also breached the agreement with regard to a planned iteration of the program for Procter Gamble products exclusively. Eileen Wong, the Co-Options sales person who had been discussing New Product Showcase with Procter Gamble, admitted on cross-examination, however, that by late July 2000, Procter Gamble had decided to table the exclusive program it had been discussing. The plaintiff has not proven that the failure of the Procter Gamble project was caused by a breach of contract by News America.
The plaintiff has proved that the defendant breached its agreement to participate in the New Product Showcase project scheduled for April 2001. In order to recover damage it must also prove that, more probably than not, it has suffered damage caused by the defendant's breach. BeverlyCT Page 2248Hills Concepts, Inc. v. Schatz Schatz, Ribicoff Kotkin, 247 Conn. 48,69 (1998); Gargano v. Heyman, 203 Conn. 616, 621 (1987).
In its own projections concerning the New Product Showcase idea, the plaintiff acknowledged that the idea would not be profitable unless Co-Options and News American achieved a particular level of participation from brands. (Ex. 21.) Co-Options concluded that if the event to be held on 5000 store/days included just one sample demonstration, two products in a sample pack and four coupons in a booklet, both parties would lose money under the agreed profit split. Co-Options projected, based on the known costs and pricing to be used, that it would make a profit of $191,000 if the program included two demonstrations, three samples, and six coupons.
A plaintiff who seeks money damages must present evidence that affords the trier a reasonable basis for measuring the claimed loss. ExpresswayAssociates III v. Friendly Ice Cream Corp., 218 Conn. 474, 476 (1991), citing Gargano v. Heyman, supra, 203 Conn. 620; Conaway v. Prestia,191 Conn. 484, 493-94 (1983). As the Connecticut Supreme Court stated inBeverly Hills Concepts v. Schatz, Schatz, Ribokoff Kotkin, supra,247 Conn. 72-74, in order to recover for lost profits from a new business with no track record, the plaintiff must present evidence to take the prospect and amount of profits out of the realm of mere speculation.
There is no basis other than speculation for concluding what level of success the parties would have had in persuading brands to pay for in-store sampling, product samples or coupons. The plaintiff asks the court to surmise that all of the brands that had reserved particular products categories for the sample packs would have proceeded to sign contracts. One brand had sent in a reservation but declined to sign a contract. Not a single brand had actually contracted with either the plaintiff or the defendant for any single element of the project, as of August 9, 2000, and the evidence provides no basis for this court to conclude that, more probably than not, enough would have done so to make the venture profitable. The plaintiff itself had calculated that if some brands, but not enough, agreed to participate, the costs of New Products Showcase would exceed the revenues.
New Product Showcase was, according to its originator, Janet Grottalio, a new and untried idea in the sector of the marketing world focussed on grocery store sales. The concept might have been profitable if vigorously pursued by both the plaintiff and the defendant, or it might have been entirely unsuccessful despite their best efforts. The absence of a track record for such co-operative programs might very well have been the result of their lack of viability. At any rate, the lack of a history of such programs meant that the plaintiff was unable to present CT Page 2249 any evidence to support its hope that the venture would have been profitable. As the Supreme Court recognized in Beverly Hills Concepts v.Schatz, Schatz, Ribikoff Kotkin, supra, 247 Conn. 72-73; damages for breach of a contract to operate a new business may be proved in a number of ways. The plaintiff in the case before this court offered only optimistic hope that brands that had not committed themselves would do so in the future and that enough of them would participate to make the project profitable, assuming that the estimates of costs were accurate.
The evidence presented does not furnish much support for the plaintiff's optimism. The plaintiff's salespeople had worked feverishly between May and August trying to interest brands in participating and had not achieved even one contract. The plaintiff asks this court to infer, without evidence, that brands would subsequently have shown more interest, and that enough would have done so to make the project profitable. The sparse evidence presented indicates that many brands declared that they had no interest or failed to follow up after expressing some interest to plaintiff's salespeople. The plaintiff has submitted charts in which its sales people rated brands as having a particular percentage of likelihood to participate in the program. These conjectures themselves were not based on prior experience, since the program was new. A sale's person's view that a prospect is, for example, "75%" likely to sign a contract to participate is based on little more than a gauging of verbal enthusiasm. Twelve prospects at that level might yet decide, on the basis of independent decisions, not to participate, and the plaintiff was unable to present evidence to support the claim that a showing of some interest at an early stage could be counted on to ripen to actual contracts obligating a brand to participate and pay the fees demanded. Not every business venture is profitable. Businesses may offer projects in which customers are simply not interested, or the volume of interest may not be enough to generate revenues in excess of costs. The plaintiff has failed to prove that profits in this instance were more likely than not.
The plaintiff has proved the existence of a contract and the defendant's breach of that contract. It has failed to prove by a preponderance of the credible evidence that it suffered damages in any particular amount as a result of that breach. In such a situation, it is appropriate for the court to award only nominal damages. Kelly v. Ivler,187 Conn. 31, 47 (1982); Mackin v. Mackin, 186 Conn. 185, 190-91 (1982). The court awards nominal damages in the amount of $1.00.
Count Two (Implied Contract)
Since the plaintiff has proven the existence of an express contract, count two, which was plead in the alternative, is inapplicable. CT Page 2250
Count Three — Promissory Estoppel
The plaintiff claims that the doctrine of promissory estoppel requires the defendant to compensate the plaintiff for expenses it incurred in reliance on the defendant's representation that it would participate in New Product Showcase. A claim of promissory estoppel is predicated on proof of two essential elements: 1) the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and 2) the other party must change its position in reliance on those facts.O'Sullivan v. Bergenty, 214 Conn. 641, 648 (1990). After the defendant communicated its agreement to participate, the plaintiff assigned sales people to the project and had other personnel spend time working on it between May 23, 2000, and August 9, 2000, when the defendant refused to participate further.
The plaintiff has not presented any evidence of the amounts it paid to those who worked on the project during this period, nor their expenses. At the end of the trial, the court inquired as to the evidence of reliance damages. The plaintiff asserted that its profit and loss statements and tax returns for fiscal year 2001 showed a decrease in revenue from 2000, and that this decrease should be construed to have been caused by the defendant's breach. The court cannot adopt the logic of this argument. Between January 2000 and May 23, 2000, nearly half of its fiscal year, the plaintiff devoted time to the New Products Showcase idea with no assurance of participation by the defendant. Its expenses for a period before the defendant agreed to participate in New Products Showcase can hardly be found to have been in reliance on such a later agreement. The only expense on the 2000 profit and loss statement (Ex. 70) attributed to New Product Showcase is the sum of $560.00, and the court has no way of ascertaining whether that expense was incurred between May 23, 2000, and August 9, 2000.
The profit and loss statement lists the compensation paid to the plaintiff's employees collectively; however, no testimony established what percentage of their time between May and August 2000 they devoted to New Product Showcase and what percentage to the many other marketing projects identified in that document. The profit and loss statement does not, at any rate, list the compensation of each of the plaintiff's employees, and the court has no way of determining how much of the total salary and benefits lines are attributable to Eileen Wong and Rhonda Kugelman, the two employees engaged in sales efforts during the reliance period.
The plaintiff's tax returns likewise furnish no basis from which this court can determine reliance damages, since they contain no indication of CT Page 2251 expenses identifiably attributable to New Product Showcase.
The plaintiff asks this court to surmise that its reliance on News America's promise to participate caused it to fail to achieve the same revenues in 2000 as it had in 1999. The court cannot agree with this wildly conjectural hypothesis. Co-Options acted on its own in its efforts before May 23, 2000, and it had no basis for reliance after August 9, 2000. As has been explained in connection with the discussion of damages claimed for breach of contract, no proof was presented to remove the issue from the realm of speculation as to what the result would have been had News America acted in accordance with its promise to participate.
The plaintiff has failed to present probative evidence that its reliance on the defendant's assurances that it would participate in New Product Showcase caused it to be damaged in any identified amount.
Count Four
In this Count, the plaintiff claims that the defendant breached an implied covenant of good faith and fair dealing that was implicit in the agreement to participate in New Product Showcase.
A party to a contract has a duty to act in good faith and to deal fairly with the other party to a contract. Gupta v. New Britain GeneralHospital, 239 Conn. 574, 598; Warner v. Konover, 210 Conn. 150, 155
(1989). This duty requires that "neither party do anything that will injure the right of the other to receive the benefits of the agreement."Gupta v. New Britain General Hospital, supra, 239 Conn. 598; Habetz v.Condon, 224 Conn. 231, 238 (1992).
News America knew in July 2000 that it was selling its sampling division and that it was therefore not going to participate in New Product Showcase as agreed. Instead of informing Co-Options immediately, it kept its intentions secret until August 9, 2000. The court finds that this failure to advise Co-Options of the change in its intentions constituted a breach of News America's duty of good faith and fair dealing. As a result of this breach, Co-Options devoted time and resources to the project between July 23 and August 9, 2000.
While the plaintiff has proved its claim of breach, it has failed to present persuasive evidence that the breach caused it to suffer damages. As has been explained above in the court's discussion of the first count of the complaint, there is no basis for concluding that it is more likely that the project would have been profitable than it would not have been, and the plaintiff has failed to prove actual damages. The court therefore awards nominal damages of $1.00 only. CT Page 2252
Count Five — CUTPA
The standard for determining whether an act or practice constitutes a CUTPA violation is the test, known as the "cigarette rule," recognized by the Federal Trade Commission in enforcing the federal statute on which CUTPA is modeled:
 (1) Whether the practice, without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers.
Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 725 (1995); A-GFoods, Inc. v. Pepperidge Farms, Inc., 216 Conn. 200, 215 (1990). All three of the criteria set forth in the "cigarette rule" need not be met to establish that an act is unfair; rather, a practice may be unfair because of the degree to which is meets one or more criteria or because to a lesser degree it meets all three. Normand Josef Enterprises, Inc.v. Connecticut National Bank, 230 Conn. 486, 522 (1996).
While there are some situations in which the same facts that constitute breach of contract also constitute a CUTPA violation, Lester v. ResortCamplands Int'l, Inc., 27 Conn. App. 59, 71 (1992); that fact does not mean that any act that constitutes a breach of contract also meets the standards of the cigarette rule.
Conn. Gen. Stat. § 42-110b (b) provides that in determining whether a practice violates CUTPA, the Connecticut's courts shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act ("FTCA"),15 U.S.C. § 45 (a)(1), as amended.
Guidance from the Federal Trade Commission and the federal courts suggests that a failure to comply with the representations made in an agreement does not constitute an unfair trade practice. In OrkinExterminating Co., Inc. v. F.T.C., 849 F.2d 1354, 1367 (11th Cir. 1988), cert. denied, 488 U.S. 1041, 102 L.Ed.2d 989, 109 S.Ct. 865
(1989), the Court of Appeals for the Eleventh Circuit held that the Federal Trade Commission had jurisdiction under section 5 of the FTCA to sanction as an unfair trade practice the plaintiff's announcement to CT Page 2253 thousands of customers that in order for the lifetime guarantee promised in their initial contract for extermination services to be honored, the consumers would have to pay annual fees. The commission and the court characterized the conduct at issue as a party's unilateral alteration of contract terms. The Court noted that the commission had differentiated between the plaintiff's widespread infliction of an injury on consumers and a "simple breach of contract." Id. The clear implication is that a simple breach of contract is not a violation of the FTCA.
The plaintiff in this case has not cited and this court has not located any interpretation of the FTCA which construes a business person's failure to fulfill a representation to another business person that it will participate in the project as an unfair trade practice subject to the federal statute.
The federal courts construing the North Carolina Unfair Trade Practices Act, which closely resembles CUTPA, have ruled that "[a] simple breach of contract, even if intentional, does not amount to a violation of the Act; a [claimant] must show substantial aggravating circumstances attending the breach to recover under the Act . . ." Bartolomeo v. S.B.Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989); United Roasters, Inc.v. Colgate-Palmolive Co., 649 F.2d 985, 992 (4th Cir.), cert. denied,454 U.S. 1054, 70 L.Ed.2d 590, 102 S.Ct. 599 (1981); Norman v. LoomisFargo Co., 123 F. Sup.2d 985, 988 (W.D.N.C. 2000). See also EmleeEquipment Leasing Corp. v. Waterbury-Transmission, Inc., 41 Conn. Sup. 575,580, 3 Conn.L.Rptr. 711, 595 A.2d 951 (1991) (striking a CUTPA claim based on breach of an agreement).
The act that Co-Options asserts was unfair was News America's sending it an email agreeing to be a partner in the New Products Showcase program at a time when News America was trying to sell the division that would do the work involved in pursuit of that project. William Fasano testified that he knew there was a "possibility" of a sale of News America's sampling division "a few months" before an actual sale was announced to Kim Kiner and the rest of the sampling division in early August 2000. (Tr. 1/30/02 p. 6-7.) He was not asked whether he knew of the sale as of May 23, 2000, the date of Kiner's email communicating News America's agreement to participate. News America signed a letter of intent to sell its sampling division to the Sunflower Group on July 21, 2000. (Ex. 106.) That letter of intent provided for a closing to occur within sixty days. It provided that sale was "subject to the ability of the parties to successfully negotiate and enter into a definitive Asset Purchase Agreement." (Ex. 106.) The evidence did not establish that the sale was anything more than a possibility before July 21, 2000, and the plaintiff did not present evidence concerning the date of the actual Asset Purchase Agreement. The evidence does not establish that on the date that News CT Page 2254 America agreed to participate in News Product Showcase, it knew that it would not actually do so.
This court does not find that it is immoral or unethical, oppressive or unscrupulous for a business to continue to engage in business transactions while it is considering a sale of the business. The evidence does not establish that News America knew in May 2000 that a sale would occur before April 2001 or that a buyer would not seek to assume the contract with Co-Options along with the sampling division. Failure to advise a party to a contract of something that is merely possible, not definite, does not appear to this court to meet the standard of unfairness articulated in the cigarette rule.
Co-Options asserts, apparently as an alternative formulation of its CUTPA claim, that it was unfair, immoral, oppressive and unscrupulous of News America not to advise it of the sale of the sampling division immediately. The evidence establishes that the letter of intent was signed on July 21, 2000, and that News America caused Fasano to advise Co-Options of the sale on August 9, 2000. The evidence does not demonstrate that the sale was a certainty at any time before July 21, 2000, and even as of that date News America and Sunflower did not have a final agreement but only one contingent on reaching agreement on additional terms. Since no statute governs the provision of such notice, the issue is whether a delay of nineteen days in notifying Co-Options of the sale offended public policy by being "immoral, unethical, oppressive or unscrupulous." The letter of intent signed by News America and the Sunflower Group expressly provided that the buyer could choose to assume some of the sampling division's on-going projects. Fasano testified that News America attempted, until just before August 9, 2000, to have the News Product Showcase project adopted by Sunflower. The court finds that News America advised Co-Options of the sale within a reasonable time of its becoming certain, and on a date before the date set for the closing. In the context of the uncertainty concerning Sunflower's interest in picking up the News Product Showcase project, the timing of notification does not constitute a CUTPA violation.
Co-Options has argued that the summer months of 2000 were crucial to the April 2001 program. The court is unpersuaded. Co-Options itself planned to continue selling efforts until December. The evidence does not support any finding that the situation was governed by time constraints that made the timing of notification oppressive or unscrupulous.
The plaintiff has failed to prove its claim of violation of CUTPA.
Counts Six, Seven and Eight — Misrepresentation
CT Page 2255
In these three counts, the plaintiff asserts that the defendant misrepresented on May 23, 2000, that it would participate in New Product Showcase and that the plaintiff relied on these misrepresentations to its detriment. A promise to do an act in the future, coupled with a present intention not to fulfill the promise, is a false representation. Flahertyv. Schettino, 136 Conn. 222, 226 (1949). From May 23, 2000, when Kiner stated the defendant's intention to participate until July 21, 2000, when the Sunflower Group signed a letter of intent to purchase the defendant's sampling division, the evidence contains no indication that the defendant did not indeed intend to participate. As William Fasano testified, until the agreement with Sunflower was actually signed, the defendant was going about its business as usual, without a way of knowing whether its plans would or would not be altered. Between May 23 and July 21, the defendant conducted itself in a manner that convinces this court that it did indeed intend to fulfill the obligations outlined in the May 23 email.
To prevail on a claim for damages resulting from misrepresentation, whether fraudulent, negligent or innocent misrepresentation, a claimant must prove that the representation was false at the time it was made.Daley v. Aetna Life Casualty Co., 249 Conn. 766, 792-93 (1999); Johnsonv. Healey, 176 Conn. 97, 101 (1978); Frimberger v. Anzellotti,25 Conn. App. 401, 410 (1991). The plaintiff asserts that because News America's senior vice-president, William Fasano, knew of "a possibility" of a sale of the sampling division "a few months" prior to August 2000 (Tr. 1/30/02 886-7) that News America knew on May 23, 2000, that the statements made on its behalf on May 23, 2000, were false. The court cannot subscribe to so illogical a contention. The evidence did not establish that as of May 23 there was any actual sale in progress and there is no basis for inferring that News America knew on that date whether a sale of the sampling division would ever actually occur. News America devoted personnel to the project, announced its participation to its staff, and spent time and money printing promotional materials for New Product Showcase. Knowledge of a possibility that an event may occur did not make false the defendant's representation on May 23 that it would participate in New Product Showcase.
The plaintiff cannot prevail on its misrepresentation claims as it has failed to prove that, more probably than not, the statement that the defendant would participate in New Product Showcase was false when made.
Conclusion
Judgment shall enter in favor of Co-Options against News America in the nominal amount of one dollar as to Counts One, Three and Four. Judgment shall enter in favor of the defendant on all other counts of the plaintiff's complaint. CT Page 2256
Judgment shall enter in favor of News America on its counterclaim in the amount of $30,000 plus interest in the amount of $5,250, pursuant to Conn. Gen. Stat. § 37-3a.
News America shall recover its statutory court costs upon submission of a bill of costs to the clerk of the court.
Beverly J. Hodgson Judge of the Superior Court